## COMBS *v.* STATE

[No. 115, September Term, 1964.]

*Decided February 5, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, SYBERT and OPPENHEIMER, JJ.

*Franklin Somes Tyng* and *Lawrence S. Lanahan, Jr.,* for the appellant.

*Robert F. Sweeney, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Edwin H. W. Harlan, State's Attorney for Harford County,* and *Donald G. Smith, Assistant State's Attorney,* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

This is an appeal by Edward Combs from a judgment and sentence of life imprisonment for rape, imposed by Chief Judge Day in the Circuit Court for Harford County, who sat without a jury.

On Monday evening, February 18, 1963, a fifty-six year old woman was assaulted and raped in the rear yard of her home in Harford County. She told police that at approximately 9:30 p.m. she heard the back doorbell and proceeded through the kitchen into the hall. As she passed through the hall, someone grabbed her from behind and yanked her off her feet onto the floor of the back porch. A struggle ensued, the victim pushed her assailant, and both went out the porch door into the yard. There was ice on the ground and the temperature was below freezing. The only light outside was that which shone through

the glass windows enclosing the porch. The struggle continued until the victim was worn out at which time the assailant had sexual relations with her, without her consent. Immediately after her assailant left the scene, the victim called the Maryland State Police, who took her to the office of a physician for examination. She gave the officers a general description of the features of her attacker, and described the clothing he was wearing.

On Tuesday, Troopers Messick and George went to the appellant's home. In the course of investigating the crime, they had obtained information causing them to suspect him as the perpetrator. Combs, twenty-six years old with a fourth grade education, had a lengthy criminal record. In addition, he had been confined in the Patuxent Institution as a defective delinquent. At the request of the officers he voluntarily accompanied them to the Benson Barracks, where he was questioned about the events of the previous evening. He was about to be placed in a cell when he started crying and pleading that he didn't know anything about the assault. A line-up was conducted that evening and the victim found that the appellant fitted the general description of her assailant, although she declined to make a positive identification.

Combs was questioned following the line-up, when he again denied implication in the crime and no information incriminating him was developed. The troopers returned him to his home, and left after arranging with him to take a polygraph examination the next day. He failed to keep the appointment and the police rescheduled it for Friday, February 22. At 9:15 a.m., Trooper Messick went to appellant's residence to pick him up for the examination at the North East Barracks, and found him preparing to have breakfast since he had no notice of the time of the test. He was asked to eat so they could depart, but at first declined to go because the trooper had no warrant. According to Combs, the officer advised him that he could get one and he then requested permission to get an attorney, but received no answer from the officer. Appellant's wife testified that her husband asked the trooper if he could see a lawyer, but said she then convinced her husband that if he was innocent he should take the polygraph examination, and he went with the

trooper to the North East Barracks where he arrived at 11:00 a.m.

According to the State police officers, Combs thereafter made three confessions. The first was a sobbing statement in a detention cell an hour or so after he arrived at the Barracks—"O. K. I did it." Then, two or three minutes later, he made a full oral confession for some twenty minutes in the polygraph room. Combs then was taken back to the Benson Barracks near Bel Air, where, beginning at two-fifteen p.m., a similar statement from him was taken down in shorthand and transcribed. It was read to him (he had only a fourth grade education and could not read and could write only his name), and he signed it.

Appellant contends that his confessions were erroneously and prejudicially admitted against him over his timely objections because (a) the confessions were the product of physical and psychological coercion and, hence, involuntary; (b) they were extracted after an illegal arrest; and (c) they were extracted after Combs had requested and been denied an attorney.

We find that the record supports the first claim of the appellant that the confessions were involuntary in fact. We do not, however, reach the second and third claims, although we note in passing that the arrest on Friday, February 22, appears to have been based on probable cause to believe a felony had been committed and that Combs had committed it, and that the State police officers categorically denied Combs' assertions that he had asked for an attorney Friday morning at his home and thereafter several times during the day, and each time had been refused. They agreed that on Friday afternoon, after the first two confessions had been given—and perhaps after the third— he had "mentioned" that he might need an attorney but had not asked to call one or have one furnished. Judge Day said he had no problem in accepting the testimony of the police officers in regard to Combs' claim that he requested a lawyer, saying to him: "Your testimony on that was not worthy of belief and the testimony of the State Troopers was very clear and convincing * * *."

Our view that the confessions were involuntary in fact is the result of the following factors. When he was taken to the Benson Barracks on Tuesday, February 19, Trooper Messick started

to put him in a cell. Combs then revealed a claustrophobic fear of cells, according to Messick, who says he began to sob and stated he hated cells, "* * * to please not to lock him in the cell." because he had been locked up in Patuxent for four years [presumably in connection with his defective delinquency] "* * * and he hated cells because they were so—as he put it, small. He was not put in a cell."

On Friday, February 22, Messick took Combs to the polygraph room at North East Barracks, where Sergeant Elwood Stacey, the State police lie detector expert, was to interrogate him. Sergeant Stacey's testimony was that he told Combs he had a right to take the polygraph test and an equal right to refuse to take it. Combs, perhaps understandably, decided to accept the latter alternative. There are three versions of what occurred immediately thereafter, but on what may be said to be the essential and controlling points they do not differ importantly or significantly. Sergeant Stacey says that he told Combs: "* * * we [the State Police] felt that he was involved in this attack, and that, in fact, in so many words, we believed that he was responsible for it." and "At this point, the defendant became agressive and, I think, dramatically upset." and Combs became "* * * irate and threw his hands up toward my face." Whereupon, according to Stacey, he acted "rather fast" and "reached and got him." Stacey admits he tore Combs' shirt, and he says: "* * * I contained him at this point, * * * he began to shout * * * that he was going to tell the Court that I was choking him and hurting him, * * * while I was talking to him to keep his hands away from me * * * he seemed to quiet down and * * * I asked Trooper Messick to return him or take him to the detention room * * * and Trooper Messick did." Stacey's testimony continued: "I asked for the key, * * * It was upstairs * * * and I asked Trooper Messick to leave [to get the key] and I would stay there and * * * at that point * * * the defendant * * * started to sob * * * and he said * * * 'O. K. I did it.'"

Combs says that when he told Stacey he was not going to take the polygraph test "* * * he got pretty sore about it * * *. He got—well, mad * * *." Combs continued: "* * * I had my hands down * * * and I didn't bring them up fast,

* * * and I was going to put them up to my face, * * * He grabbed me in my shirt here, and he said boy, don't you ever raise your hands to me, * * * and he said you're threatening me, and I said I ain't threatening you at all, I said I haven't done anything, and he said don't you sit there and tell me that lie either. * * * I know you're the one that done it, and I said no, I'm not either, and so when I said no, I'm not either, * * * he shoved me backwards and my head hit the wall behind me, and that's when I told him that I was going to see that the Court found out about it." Combs says he had a red place on his shoulder where Stacey "grabbed" it and a knot on his head, and that Stacey "* * * told me that I was going to take the test, whether I wanted to or not. That's the exact words he said. * * * I said no, and that's when he started to call me a bunch of names, * * * a wise punk, * * * no damn good, * * * dangerous to society. * * * He told me to get up then. * * * he said Mr. Messick, open that door down the hall there, and he grabbed me behind the back of the neck here and by my belt line and picked me up. * * * and shoved me down the hall, and he said you're going in here and you're going to stay in here. * * * you'll stay in there until you get ready to talk".

Combs went on: "* * * I didn't say a word. * * * and then I stood there, and then * * * I called Mr. Stacey and I said I want to talk to you, * * * and I said well, let me out of the cell and I'll talk to you, and my wife was in—pregnant, * * * I said look, I haven't done anything and I want to go home to my wife, and he said you ain't going no damn place, * * * no where until you talk, * * * I'm here to get a statement, and he says I'm going to get it."

Trooper Messick did not, in rebuttal, contradict or refute the essentials of Combs' version of the affair. On the striking of the head against the wall, he said (having been present at the time): "I do not know. I do not believe so, because he made no mention of striking his head." He did not observe any grabbing of the neck and pants. "There was none to my—I did not see it." He denied that Stacey told Combs he would stay in the cell until he told them what happened but said he wasn't standing next to them (Stacey said he was some twenty-five

to thirty feet away for a time) and he agreed that his back was turned towards Stacey and Combs for several minutes.

In our opinion the State did not meet its burden of showing that the first confession was freely and voluntarily given and was not the product of force or fear, as it must. *Abbott v. State,* 231 Md. 462, 190 A. 2d 797. Whether a confession was free and voluntary depends on the facts and circumstances of the case. *Bean v. State,* 234 Md. 432, 199 A. 2d 773. Here a young man of apparent intellectual deficiency or emotional unbalance or both, with a pathological fear of confinement in a cell was, we think the testimony fairly shows, physically hurt because he would not talk and psychologically at a disadvantage due to immediate confinement, so feared by him, and the threat of further confinement lasting until he did talk. The situation is not to be distinguished from those in *Thiess v. State,* 235 Md. 541, 201 A. 2d 790 and *Haynes v. Washington,* 373 U. S. 503, 10 L. Ed. 2d 513, in both of which duress was found from the testimony of the prisoner, essentially uncontradicted or refuted that he would be kept in confinement—here a dreaded circumstance—until he confessed. Here there is the added fact that the police had physically and verbally given the prisoner substantial cause for fear before confining him. Cf. *Jackson v. State,* 209 Md. 390, 395-396, 121 A. 2d 242.

The second confession followed the first in a matter of two or three minutes. The third was but a formal transcribing of what already had been said, supervised by Trooper Messick who had been an original jailer in his detention in the cell which induced, in part at least, the first confession.

After the first confession was obtained from Combs, the second and third appear to have flowed from him as a natural and unbroken consequence without the break of a significant passage of time or a change in environment or of interrogators, to remove the initial taint as in *Mefford and Blackburn v. State,* 235 Md. 497, 201 A. 2d 824 and *McCleary v. State,* 122 Md. 394, 89 Atl. 1100.

We have said in prior cases that where one confession is held to be involuntary and inadmissible, the State must overcome a presumption that the improper influence which produced the first confession is still in effect until a cessation of that influence

is definitely shown, and the evidence to overcome and rebut such a preumption must be clear, strong and satisfactory, and any doubt on this point resolved in favor of the accused. See *Kier v. State*, 213 Md. 556, 132 A. 2d 494; *Jackson v. State*, *supra*, and *Edwards v. State*, 194 Md. 387, 71 A. 2d 487. There is nothing in this case to show that the improper influences which produced the oral confession did not continue through the time when Combs made his written confession. We think under the facts and circumstances disclosed by the record, prejudicial error was committed in admitting the confessions into evidence, so that on this ground the judgment must be reversed and a new trial awarded.

We find no merit in the appellant's claim that he was illeg-ally detained on Tuesday, February 19, since the record shows he went willingly with the State troopers to Benson Barracks. His further claim that the line-up procedures were unfair and prejudicial is likewise not supported by the facts disclosed by the record.

The appellant also claims that the lower court committed re-versible error in admitting into evidence, over objection, the clothing because it was obtained through an illegal search and seizure. We do not agree. The arrest on Friday morning was not illegal. The testimony indicates that the clothing admitted into evidence was voluntarily released to the troopers by the appellant. Trooper Messick testified in answer to a question if he had a search warrant:

> "We would have obtained a search warrant if he hadn't have told us where it was and that we could have it. He told us we would take him to the home and he would give it to us, and he never debated that. We just took him and we asked him where it was and he said it was in his room and we told him we would like to have that and we took him to the resi-dence and he turned it right over to us."

Further, Corporal Wellman testified:

> "We had previously asked Combs where the clothing was that he had worn on this particular night and he

stated that it was in the bedroom at his home. We asked his permission to go into the home with him and he gave us that permission. We went to his house, picked up a pair of shoes, a pair of pants, and a jacket. He got them out of the bedroom. Well, we were in the same room with him. He picked them up and handed them to Trooper Messick."

Although the appellant denied parts of the troopers' testimony, he did admit that he had nothing to hide and showed the clothes to the officers. From this testimony and examination of the record we hold that the trial judge, as a trier of the facts, could have properly found as he did that the appellant consented to having the police accompany him to his home and there voluntarily gave to the officers the articles of clothing which were introduced into evidence. Combs can not now complain of a search to which he freely consented. *Gross v. State,* 235 Md. 429, 201 A. 2d 808; *Shields v. State,* 229 Md. 153, 182 A. 2d 348; *Lyles v. State,* 203 Md. 605, 102 A. 2d 291; *Robinson v. State,* 200 Md. 128, 88 A. 2d 310.

In addition to the contentions discussed above, the appellant has apparently requested his counsel to present four additional questions on this appeal: (1) was he denied a jury trial against his will; (2) did the rulings and remarks of the trial judge show that he was deprived of a fair and impartial trial; (3) was he denied a speedy trial; and (4) was the testimony of the complaining witness unworthy of belief. A careful review of the record discloses no support for any of these questions.

> *Judgment reversed and case remanded for a new trial, costs to be paid by the County Commissioners of Harford County.*