ALPHONSO WIGGINS *v.* STATE OF MARYLAND

[No. 280, September Term, 1968.]

*Decided May 2, 1968.*

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Michael Lee Kaplan,* with whom was *Morris Lee Kaplan* on the brief, for appellant.

*Henry J. Frankel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan,*

*Jr., State's Attorney for Baltimore City,* and *Stephen Montana-relli* and *John H. Lewin, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Rosina DiPaula, single, age 76 years, 5 feet tall, weight 128 pounds, died in Maryland General Hospital on 12 November 1966. The opinion of the Medical Examiner was that she died of broncho-pneumonia complicating extensive head injuries with brain damage and that the manner of death was homicide.

Alphonso Wiggins, age 15 years, was charged with her murder. He was found guilty of murder in the first degree at a court trial in the Criminal Court of Baltimore and sentenced to imprisonment for the balance of his natural life.

Rosina DiPaula lived with her elderly sister, Concertina, also single, at 1323 West North Avenue. Rosina was in good health on 4 October 1966, active, with her sister, in their embroidery work which they did in a sewing room on the second floor of their residence. Their brother, Joseph DiPaula, whose practice was to stop by to see them, both in the morning and in the afternoon, about five days a week, visited them at 6:00 P.M. that day. They were in the sewing room working. He ate a dish of broth they had prepared for him. Concertina asked him to cash Rosina's social security check in the amount of $68, but he had only $50 which he gave Concertina—"3 tens, 3 five dollars and five one dollar." As he left the house about 6:30 P.M. he saw a young man, a Negro, standing outside the door on the steps. He was wearing a white jacket with "University of Maryland" on it in blue lettering. He had a conversation with the boy, "Thinking—hoping he would step down from the steps and go away. But, he did not make any effort." The boy remained on the steps while DiPaula went to the corner and bought a newspaper in a drugstore. DiPaula watched him and "after a little while he stepped down, he walked toward the curb, he look up and down, then he came towards me." The boy apparently made a telephone call from a booth on the corner and then walked away. DiPaula remained on the corner, allowing several buses to go by and then took a bus and went

to his home. When he got home his wife had received a telephone call about his sisters and he went to the Maryland General Hospital. "They were beyond recognition * * * Their heads were swelled up and they were full of blood, and their hair was full of blood, their dress was full of blood, and they were just in a dying state * * * They were unconscious."

On 4 October 1966 about 6:40 P.M. Sergeant James Osborne and Officer Richard Catania of the Baltimore City Police went to 1323 West North Avenue in response to a call that a burglarly was being committed at that address. The vestibule door to the house was closed but not locked. The main door had been broken, one of the hinges had been torn loose and the door was hanging from the other hinge. They entered and found Concertina DiPaula and Rosina DiPaula in the hallway, each lying in a pool of blood. Osborne testified, "There was a lot of blood, I estimate maybe three-quarters of a pint or pint around each one of them, and difficult to tell where they were injured, so much blood all mixed up in their hair and all." Rosina was by the telephone with the receiver in her hand but the phone had been jerked from the wall and "was no longer in operation." The police heard "a noise out back as if someone was leaving the house" and Catania ran toward the kitchen. Osborne went to the second floor. There was blood from where the sisters were found on the first floor all the way to the sewing room on the second floor. The entire house had been ransacked,—doors and drawers pulled open, a mattress on a bed on the third floor rolled up and removed from the bed, pillows thrown on the floor, papers strewn about, clothes taken from closets and discarded on the floor, chairs knocked over. Officer Davis had also received a call about the burglary. He went to the rear of the 1300 block West North Avenue. As he drove up the narrow alley he saw a boy running out of a rear yard of a house in that block. The boy was carrying what appeared to be a shoe box and a couple of books under his arm. In his other hand was what appeared to be a gun. As the police car proceeded up the alley the boy fired three shots at it. The boy ran up an intersecting alley. The police commanded him to halt and fired two shots at him but he continued running to

Etting Street when he was joined by another youth. They both ran up an alley in the rear of the 2300 block Etting Street and the police lost sight of them. Rosina and Concertina DiPaula were taken to Maryland General Hospital in an ambulance.

Antonio Vega, age 13 years, was with the appellant, Willie June and Lee Cephus about 6:00 P.M. on 4 October 1966. Vega was wearing a white University of Maryland jacket. They went "up on North Avenue" to the super market and June suggested they snatch a pocket book but Vega said he did not want to do that. June then said, "Well we wait until they go in the house then we get their money." [1] Vega declined to do this and the others asked him to watch for them. He stayed outside the house to "watch out for them * * * If anybody come to tell them somebody coming." The other three went into the house. After a while he heard somebody scream. The scream come "out of the house they went * * * It sound more like a women." Vega was scared. He saw the police coming and hollered police and ran. He went to a cellar on Brunt Street and the appellant, Cephus and Elders were there.[2] Cephus had a cigar box containing "earrings and stuff" and he had some money in his hand. The appellant had a gun and some empty cartridge cases. The appellant had blood on his hand and wiped it on Vega's jacket. Vega left, leaving the jacket.

Rudolph Matthews, age 14 years, saw the appellant, June and Cephus on 4 October at a sandwich shop at Pennsylvania and Lafayette Avenues. June said they were going to make some money and the three of them went "down North Avenue." He saw the appellant the next day playing dice with some other boys. The appellant told him "he made a hustle." The appellant had money—"fives, ones, tens," and some jewelry which he said he got and was going to pawn. He had seen the appellant with a gun two or three weeks before.

1. It is not clear from Vega's testimony but it appears from other evidence that the DiPaula sisters were walking on North Avenue and that it was the pocketbook of one of the them that June wanted to snatch.

2. It seems that "Elders" is Willie Green Elder which is apparently the correct name of Willie June. Willie Green Elder was indicted with the appellant.

100

Allen A. Jones, age 14 years, saw the appellant the early part of October in a group playing "Skelly." The appellant "was talking. He said him and Lee (Cephus) was on North Avenue and they went in the lady's house and took and beat the ladies with brass knuckles and iron pipes, and they was saying they were searching for money." The appellant's jacket "had something red on it."

Eugene Golden, age 13 years, also saw the appellant the early part of October. "He (the appellant) say he made a hustle up on, he said he was up there, North Avenue, a super market and say when he seen these two old ladies come out, he walked around the back. At first him and Lee was talking to them, then he say he walked around the back. He said he seen the lady going in the market, then he say he walked around the back and tried to get in the door, so he couldn't get in the door. When he came back around he seen the two old, seen the two ladies, then the lady walked in the house, so he said I planned this. He say I going to play this thick. * * * He said, he say I play this thick. He say when they came to the door I knocked on the door and said who is it. He said, collectors. And when the lady got the door half way open, that is when he say he forced his way in. * * * He said when he broke the chain, he said there was a lady upstairs, he say he hit, somebody hit the lady and say when the lady upstairs heard them scream, then when the other lady upstairs and somebody somebody chased them back upstairs. I have forgotten who he say chased her back upstairs. * * * He say, after he told me that, then, that is when he had all that money." Golden saw money in the appellant's possession; "he had a couple of tens and fives and ones." He also saw that the appellant had brass knuckles, a gun and a night stick. The appellant told him that he went out the back of the house "and somebody said halt, and somebody shot at him, and he jumped over the back wall." While he was in the presence of the appellant, Cephus came up and Cephus and the appellant "got to fussing" and the appellant gave Cephus some money.

Jerome Wells, age 13 years, was one of the group shooting "Skelly." He heard the appellant say that "he had beat these two old ladies with iron pipe and brass knuckles."

Evidence sufficient to prove the corpus delicti was admitted by stipulation.

As part of its case, the State, in addition to the evidence as above summarized, offered a statement made by the accused on 9 November 1966 at Boys' Village.[3] On the issue of the voluntariness of the statement, the State produced Detective Howard Corbin of the Homicide Squad of the Baltimore City Police Department. Corbin said that he interrogated the appellant in a large office or assembly room at the Village in the presence of Detective William Craig, Detective Edward Chlan and John Swenson, a social worker employed at the Village. Prior to questioning, the appellant was "advised that he could remain absolutely silent, that he had a right to an attorney to advise him, or be present with him during the taking of any statement whatsoever. If he wished to stop on making these statements he could do so at any time he so desired * * * He was also advised that any statement that he made could be used against him in a court of law * * * If he did not have an attorney, or couldn't afford an attorney, that we would be obligated to appoint counsel for him, and that the counsel would be present during the taking of the statements." As each right was explained to the appellant he was asked if he understood and he replied that he did understand. When all the rights had been explained to him he was asked whether or not he wanted to make a statement and he said that he did. No threats were made to him, no promises were made and no force of any type or threat of force was used. Swenson testified that he had charge, as a social worker, of the cottage to which the appellant was assigned. He was present during the entire interrogation on 9 November. No promises were made to the appellant, no force was used on him, no one placed "any hands" on him. "We sat down and talked calmly. The detectives informed the boy of what his rights were, and things like that * * * He under-

---

3. The appellant testified that he had been arrested on 5 October 1966. He had been hooking school and was picked up for watch stealing. He apparently was not held at that time for he further testified that "they questioned me, turned me loose, picked me up, questioned me, turned me loose." He was presented and indicted on the murder charge on 15 November 1966.

stood everything * * * that is the way he appeared." The appellant appeared calm; "his attitude seemed to be one to want to cooperate with the interrogators."

The defense produced the mother of the appellant on the issue of the voluntariness of the statement. She said that the police requested her to come to the police station about 11:00 P.M. on 2 November 1966. A white officer and a negro officer were with the appellant. She did not know the names of the officers. The white officer left the room and the negro officer asked the appellant if he was ready to make a statement. The appellant said "he didn't have nothing to tell him. He told him twice. And as he told him that Alphonso kind of raised his voice at him a little bit, and this colored officer hauled off and slapped him and shoved him in that chair over there and told him not to get smart with him. He done told him he didn't know nothing about what happened, and said he didn't have nothing to happen, and he said, furthermore, I didn't ask you to go get my mother." He made no statement at that time. She said the police got her another time at night but she did not know the date. On cross examination she said that it was sometime in November and when she arrived at the police station the appellate told her he did not send for her. On cross examination of her with regard to her first visit at the police station on 2 November, it appeared that the police informed the appellant as to certain of his rights but she could not recall what was said to him in any significant detail. The defense also called Detective Craig. The substance of his testimony was that he had not informed the appellant's mother that they were going to talk to the appellant on 9 November. The appellant did not testify on the issue of voluntariness.

The trial court found on the evidence before it as to voluntariness that the appellant was advised as to his constitutional rights and that he understood them; that he acquiesced in giving a statement and that the statement was made freely and voluntarily, without any threats and promises.[4] The statement

---

4. On cross examination of Detective Corbin on the issue of the voluntariness of the statement, it seems, although the record is not clear, that the appellant also made a statement on 18 October 1966,

was held to be admissible over objection. Corbin testified that the appellant said that Willie June and Gary Cephus (apparently also known as Lee Cephus; he is sometimes referred to as

---

on 2 November 1966 and on 3 November 1966. Corbin was not present on 18 October but was present on 2 November and 3 November. As to 3 November Corbin said the appellant was "advised of his rights again," and that the appellant's mother and officer Walter Howard were also present. Corbin denied striking the appellant or pushing him into a chair. After the trial court admitted the statement of 9 November, Corbin testified as to the contents of that statement, as hereafter set forth in this opinion. On cross examination of him, defense counsel elicited from him the content of the statement of 2 November. It was taken at 9:50 P.M. in the presence of Corbin, Lt. James Cadden and Sgt. Edward Bromwell at the Homicide Office at police headquarters. After the appellant was advised of his rights, he said that he was with Lee (apparently Lee Cephus, although he is referred to at one place as Herman Lee) and Antonio (Vega) in front of the food market on North Avenue and saw two old ladies. Vega suggested they snatch the ladies pocketbooks but the appellant said there were too many people. The ladies went down North Avenue and entered a house. The boys waited for them to come out and when they did not come out the appellant suggested they go back down to the food market. Lee said, "No, let's go and knock on the back door." Antonio said that he was going to keep watch. The appellant went around the back at Lee's direction but there was a dog back there. He came back to the front of the house but before he got there he heard someone screaming. When he got to the front of the house the door had been "busted open, the door had been kicked off the hinges."

The appellant walked up the steps, heard a shot and ran. He ran across North Avenue to the 1400 block Brunt Street and went in a cellar of an empty house at 1433 Brunt Street. He heard Eugene Golden talking on the front steps. Lee arrived. Lee said he had rung the bell and Antonio kicked the door in. The lady hollered that she was going to call the police and Antonio pulled the telephone off the wall. Antonio said he hit the lady and knocked the other lady out. Lee found some money, heard a shot and ran out the back door. Antonio went out the front door. Lee and Antonio had a lot of money, "some tens, three five dollar bills, and a whole lot of ones." The appellant asked for his share but neither would give him any.

The record does not disclose the content of any statement made by the appellant on either 18 October or 3 November.

"Lee" by the appellant) went into the house with him. Willie went in first, the appellant next and Gary last. The appellant and Lee went into the kitchen. Willie said all the good stuff is upstairs and went to the second floor. A woman came out of the kitchen and Lee struck her. The appellant heard noises upstairs like someone fumbling and fighting. He pulled the telephone from the wall. Lee told him to do it. Antonio told them the police were coming. Lee ran out the back and the appellant followed. Willie ran out the front door. The appellant fired two shots at the police and ran. "I got $7.25 or more from the—Willie June told me on Brunt Street that if I told on him he would kill me." The appellant was asked where he was before going into the house on North Avenue and he said that he, Willie June and Lee sat on the steps of 1323 West North Avenue. A man came out of the house they went in and a lady came out of "the house of the steps we were seated on." The appellant said they hid "our stuff out in the back yard of 1433 Brunt Street." They had guns and knives. He said, "I did not tell you anything about Willie June before because I was afraid of him."

At the conclusion of the evidence offered by the State the appellant moved for a judgment of acquittal as to murder in the first degree on the ground that there was not sufficient evidence that the homicide was committed in the perpetration of a robbery "or a felonious crime happening." The motion was denied.

The defense called Pearl Stallings who lived at 1326 West North Avenue. Her testimony corroborated the testimony of Joseph DiPaula with regard to the boy standing on the steps of 1323 West North Avenue when DiPaula left that house. She also said she saw the boy a second time and he went in the vestibule door. She neither saw nor heard anything else.

The appellant testified in his own behalf. He denied breaking into or entering the house. He admitted telling the boys who testified for the State that he "knew something about it" but denied he told them that he "did something." He said he had been hooking school and was arrested on 5 October 1966 for watch stealing. He gave them the names of Lee, Wells, Golden and Matthews as boys "I hang around with." He said that the

statement he gave the police on 9 November was not a true statement. He claimed that he made the statement because the police told him at Boys' Village "that everything is all right, go ahead, tell us the story, get it off your chest. I still denied it; ain't nothing going to happen, you stay here for a while, everything is okay. So I say, if I give you a story will you leave me alone? Yuh, we leave you alone. I give them the statement."[5] In answer to his counsel's question, "Are you saying now that you had absolutely nothing to do with this crime up on North Avenue?" he replied, "Yes, sir." He had nothing else to tell the court in reference to the case.

At the close of all the evidence the appellant renewed the motion for judgment of acquittal previously made and it was denied.

On appeal from the judgment the appellant contends that the statement was improperly admitted in evidence and that the evidence was not sufficient to sustain the convictions.

In *Luther Robinson v. State,* 3 Md. App. 666, Chief Judge Murphy, speaking for this Court, said:

> "It is well settled that in order for a confession to be admissible into evidence against an accused, the State must prove that it was voluntary and not the product of force, threats, promises or inducements. * * * Otherwise stated, to be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' * * * In post-*Miranda* trials, where the State seeks to introduce a statement taken from an accused during custodial interrogation, it must, as part of its proof of voluntariness, affirmatively show that all warnings required to be given to an accused by that case prior to such interrogation were so given, * * * and that the accused, in giving the statement, understood his rights

---

5. As hereinbefore noted, the appellant did not testify as to the voluntariness of the statement. In any event, this allegation of what was said to him was refuted by the testimony of Corbin and Swenson.

and knowingly and intelligently waived them, * * *. The basic standard governing the admissibility of an extra-judicial statement is whether, considering the totality of the circumstances, the statement was voluntary. * * * Within this constitutional framework, the question of whether a confession should be admitted in evidence is ordinarily a matter for the trial court to decide and its determination will not be disturbed on appeal unless there was a clear abuse of discretion. * * *. (citations omitted)."

We find no clear abuse of the discretion of the trial court in admitting the confession of 9 November 1966. We think that the State proved that it was voluntary and affirmatively showed that all warnings required to be given prior to interrogation were so given and that the appellant, in giving the statement, understood his rights and knowingly and intelligently waived them. The age of the appellant, in itself, did not render the confession involuntary. *Harris v. State,* 1 Md. App. 318, 322. The appellant contends that prior statements made by him were not shown to have been free and voluntary and therefore the statement of 9 November was not admissible. We do not agree with the appellant that the rule is that the giving of an involuntary statement necessarily precludes the admission of any subsequent statement. In *Clewis v. Texas,* 386 U. S. 707, it was held, under the circumstances of that case, that a subsequent confession to the same crime could not be separated from an earlier coerced confession because "there was no break in the stream of events * * * sufficient to insulate the statement from the effect of all that went before." In *Keller v. State,* 2 Md. App. 623, we found on the facts of that case that the compelling background of improper inducements which produced a first confession was not so dissipated as to render a subsequent confession free and voluntary. In *Combs v. State,* 237 Md. 428, there were three confessions made by the accused. The first was not freely and voluntarily given. The second followed the first in a matter of two or three minutes and the third was but a formal transcribing of what had already been said. The Court said, page 435 :

"After the first confession was obtained from Combs, the second and third appear to have flowed from him as a natural and unbroken sequence without the break of a significant passage of time or a change in environment or of interrogators, to remove the initial taint * * *."

We think the rule is as stated in *Combs* at page 435 :

"[W]here one confession is held to be involuntary and inadmissible, the State must overcome a presumption that the improper influence which produced the first confession is still in effect until a cessation of that influence is definitely shown, and the evidence to overcome and rebut such a presumption must be clear, strong and satisfactory, and any doubt on this point will be resolved in favor of the accused."

In the instant case we cannot say from the record before us that the State met the burden of proving that whatever statements the appellant made on 18 October, 2 November and 3 November were free and voluntary.[6] But we do not think that it was necessary that it do so. Even if it be assumed that those statements were not free and voluntary, including a failure to give the *Miranda* warnings,[7] we feel, as between them and the confession of 9 November, that there was a significant passage of time and a change in environment and of interrogators as to remove any initial taint. The statements prior to that of 9 November were given in a police station; the statement of 9 November was given in a large office or assembly room at Boys' Village, six days after the last prior statement. There was a substantial change in interrogators.[8] We think the

---

6. We note that the statement of 2 November 1966 was placed in evidence by the appellant upon cross examination of a State's witness on the merits of the case. It was not offered on the issue of the voluntariness of the statement of 9 November.

7. The evidence indicates that warnings were given as to the statements of 2 and 3 November, although a mere statement that the appellant was "advised of his rights" would not be sufficient proof under *Miranda.*

8. The record does not disclose who the interrogators were on 18 October but Detective Corbin was not one of them. On

presence on 9 November of John Swenson, the social worker at Boys' Village, was significant. He said that he worked with the boys at the Village in counseling capacities and performed other duties entailing social work at the institution. The appellant was in a cottage in the charge of Swenson. Before questioning the appellant the officers "were briefed on our procedure at Boys' Village, which is that whenever boys to be interrogated by law enforcement officers, or detectives, that a social worker be present at that time." Considering all of these factors and the absence of any allegation or evidence by the appellant that his confession of 9 November was induced by or resulted from his prior statements or the circumstances surrounding them lead us to believe that there was a break in the stream of events sufficient to insulate that confession from the effect of all that went before so that anything improper that may have attended the giving of the prior statements was so dissipated as to not render the confession offered by the State free and voluntary. We think that the totality of the circumstances attending the confession given by the appellant on 9 November does not require a reversal of the trial judge's finding that it was voluntary.

In support of the contention that the evidence was not sufficient to sustain the conviction, the appellant states in his brief: "If the Court should reverse the findings on the admissibility of the statement, there would not be sufficient evidence to convict the Defendant." In that event, he urges, there would be no corroboration of the testimony of Vega, an accomplice to the crime. We agree that the evidence, including the statement of the appellant, was sufficient to prove the *corpus delicti* and the criminal agency of the appellant. As we have found that the statement was properly admitted, the contention fails. We need not decide whether the testimony of Vega, assuming him to be

---

2 November Lt. James Cadden conducted the interrogation and Sgt. Edward Bromwell and Corbin were present. On 3 November Corbin conducted the interrogation and Officer Walter Howard and Mrs. Janie Wiggins, the mother of the appellant, were present. On 9 November Detectives Corbin, William Craig and Edward Chlan and the social worker, John Swenson were present.

an accomplice, was sufficiently corroborated as required by the rule stated in *Boone v. State,* 3 Md. App. 11, 19.

On appeal, the appellant presents no contention that the homicide was not murder in the first degree. In any event, we think that the evidence justified the court below in a first-degree verdict because the homicide was committed in the perpetration of a robbery. Md. Code (1967 Repl. Vol.), Art. 27, § 410. There was evidence that the appellant and his companions were going to rob the DiPaula sisters on the street by snatching a pocketbook from them but were deterred by the presence of "too many people." They decided to "wait until they go in the house then we get their money." They knew the women were in the house when they broke in and we think it clear that they entered the house with the purpose and intention of taking the property of the women from them by means of actual or implied force—the crime of robbery—and committed that crime, killing Rosina DiPaula in its perpetration. See *Harrison v. State,* 3 Md. App. 148.[9]

*Judgment affirmed.*

---

9. The instant case is not factually apposite to *Kier v. State,* 216 Md. 513, where the defendant entered a home in the daytime and murdered a woman therein. The evidence in *Kier* showed that it was not the purpose or intention of the defendant to commit an assault upon the woman to take property away from her but rather to steal articles from the empty home or at least a home he thought was empty. It was on those facts that the Court concluded that a verdict of murder in the first degree was not properly predicated upon a finding that the murder occurred during the perpetration of a robbery.

It appears that the breaking and entering of the dwelling house in the instant case was not committed in the nighttime. In Maryland "nighttime" with regard to burglary is not defined by statute. The ancient rule was that from sunset to sunrise it was night for the purposes of burglary. 1 *Hale* P. C. 550. But at common law "nighttime" was not so rigidly fixed. "If there be daylight or crespusculum enough, begun or left, to discern a man's face withal, it is no burglary. But this does not extend to moonlight." 4 *Blackstone Comm.* 224. And it does not extend to artificial light; nor, on the other hand, can smog or fog turn "daytime" into "nighttime." *Perkins on Criminal Law* (1957) Ch. 3, §1E, p.165. "The time when the moon or the sun rises or sets on a particular day is judicially known * * * Judicial knowledge extends to the duration

---

of day and night at a particular place at a particular time, and therefore that at a certain hour on a certain date it was or was not daylight * * * If they are proper subjects of judicial knowledge, the judge may inform himself in any way which may seem best to his discretion, and act accordingly." (citations omitted). *Bowser v. State*, 136 Md. 342, 347-349. According to the Almanac Office of the Naval Observatory the sun set in Baltimore, Maryland on 4 October 1966 at 6:47 P.M. daylight savings time. The police report of the crime was received "about 6:40 P.M.", seven minutes before sunset. Therefore the dwelling house of the DiPaula sisters was broken and entered in the daytime and not in the nighttime. Thus the crime was not burglary, either at common law or under the provisions of Md. Code (1967 Repl. Vol.), Art. 27, § 30 a, both of which require the breaking and entering to be in the nighttime. Code, Art. 27, § 410 provides that murder is murder in the first degree when committed in the perpetration of or attempt to perpetrate specifically designated crimes—rape, sodomy, mayhem, robbery, burglary and escape or attempt to escape from a penal institution. But in view of our finding that the murder in the instant case was committed in the perpetration of a robbery, it is not necessary that we determine whether the crime proscribed by Code, Art. 27, § 30 b (the breaking of a dwelling house in the daytime with intent to commit murder or felony therein or with intent to steal personal goods of another of any value therefrom) is a burglary within the purview of § 410. We noted in *Reagan v. State*, 2 Md. App. 262, 267, however, that § 30 b does not designate the crime proscribed therein to be a burglary as does § 30 a.