HERBERT J. JONES, ALIAS "HALF A HEAD"
*v.* STATE OF MARYLAND

[No. 80, September Term, 1969.]

*Decided January 12, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Michael Lee Kaplan* (*Morris Lee Kaplan* on the brief) for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Charles West, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Herbert J. Jones, the appellant, was found guilty of murder in the first degree without capital punishment, for which he was sentenced to life in prison, and robbery with a dangerous and deadly weapon, for which he was sentenced to a concurrent term of ten years. The trial was by jury in the Criminal Court of Baltimore.

On appeal, Jones contends: (1) his confession was involuntary; (2) the State improperly allowed evidence, known to be false, to remain uncorrected; and (3) the evidence was insufficient.

A Mr. and Mrs. Henry Bell testified to substantially the same facts. On September 6, 1968, George Burgess, the murder victim, spent the evening with them. At about 1:00 A.M. on September 7, 1968, Burgess went into a public phone booth on the corner of North Avenue and Calvert Street in Baltimore to make a call while the Bells went into the other phone booth "to keep warm." While the trio was still in the phone booths, a group of four or five young men came up. Two of the men stood in front of the phone booth where Burgess was while

the others removed the Bells from their phone booth and pushed them five to eight feet down the street away from the phone booths. The Bells said that they were asked if they had any money, to which Mr. Bell replied no. They were confronted by a boy who had a leather strap cut down the middle to make a whip. A bottle of vodka was taken from Mrs. Bell.

While Mrs. Bell was emerging from the phone booth, she noticed one of the men had a revolver. While being held, she saw the man with the gun fire into the phone booth at Burgess. Mrs. Bell thought she heard three shots while Mr. Bell thought it could have been either three shots or two shots and an echo. After the shooting all of the men ran away. An ambulance came a few minutes later; Burgess was prounced dead on arrival at the hospital. Neither of the Bells identified any of the men.

From the testimony of one Paul Mouzon it appears appellant procured a revolver from Mouzon on the evening of September 6. Mouzon testified also that when the gun was returned to him, it had two empty chambers. Mouzon surrendered the gun to the police. Due to the mutilated condition of the single bullet that killed Burgess, a ballistics test identifying the murder weapon was not possible.

Ernest Couplin, a codefendant, testified for the State that appellant and one Joseph Smith were in front of the phone booth which Burgess occupied. After hearing someone shout "Don't shoot the man," Couplin saw Smith shoot Burgess and heard two shots. Couplin said that Smith shot the victim after asking for money. While admitting taking the vodka, Couplin denied pushing Mrs. Bell, having a strap or whip, or robbing the Bells.

Thomas Wallace, another codefendant, also testified for the State after his attorney was present and his rights explained to him. Wallace testified that on the night in question, he met with the appellant, Smith, and Couplin. The group of four went to a restaurant to get something to eat, but appellant and Smith left the restaurant ahead of Wallace and Couplin. Wallace testified

that by the time he and Couplin caught up with appellant and Smith, the latter pair were standing in front of a phone booth talking to the man inside; Wallace heard appellant and Smith ask someone for money. Wallace and Couplin walked past where Jones and Smith were talking to the man in the phone booth and talked with the woman in the other booth but the conversation was merely casual. Wallace denied asking the Bells for money, attempting to rob them, taking Mrs. Bell's vodka, or having a whip. Wallace said he heard two shots after which his three friends ran away. Seeing his friends flee, Wallace fled also. The group ended up at appellant's apartment where Wallace saw a gun for the first time that evening. It was a small nickel-plated, black-handled revolver. When Wallace saw the gun, appellant was in the process of removing two bullets. Wallace then went to sleep and when he awoke, the gun was gone. Although Wallace heard the shots, he did not see who did the shooting. On cross-examination Wallace denied there was any arrangement for dropping some of the charges against him in exchange for his testimony against appellant.

The presence or absence of an agreement between the State and Wallace concerning his testifying is clarified by an affidavit signed by an Assistant State's Attorney and included in the State's brief, and its accuracy was stipulated by appellant's counsel. The affidavit reads:

"August 25, 1969

"Affidavit

"Re: State of Maryland v. Herbert J. Jones
"This affidavit is furnished to Mr. Michael Kaplan at his request in regard to the case mentioned above.
"Several days prior to the trial of this case I advised Mr. Kaplan that the State had offered co-defendants Wallace and Couplin a Plea of Guilty to the third count (Common Law Robbery) in return for their testimony against Mr.

Jones, and would dismiss all other indictments. I had made this agreement with counsel for each of the co-defendants. It was my understanding at the time that defense counsel for Wallace and Couplin would not communicate the terms of the agreement to their clients, and thus when Mr. Wallace denied knowledge of a 'deal' during his testimony at the Jones trial, I assumed he was telling the truth. Counsel for Mr. Wallace was present in the courtroom throughout his testimony.

"In a subsequent trial of a fourth defendant, involving the same charge, attorneys for both Messrs. Wallace and Couplin were called to the stand to testify as to whether they communicated the fact of the State's agreement or 'deal' to their respective clients. Mr. Roland Walker, attorney for Mr. Wallace, to my surprise, testified he *did* convey the terms of the agreement to Mr. Wallace, several weeks before the trial of Mr. Jones. The attorney for Mr. Couplin, Mr. Joseph Thomas, testified that he *did not* convey the terms of the agreement to his client prior to the trials involved."

"Assistant State's Attorney"

(Emphasis in the original)

## I    Confession

Appellant's trial counsel objected to the admissibility of appellant's statement to the police and required a hearing out of the presence of the jury on that point. At the end of that hearing, trial counsel excepted to the court's ruling as to admissibility, but in the presence of the jury, counsel specifically waived objection to the admissibility of the statement. We think this waived his right to have us review the finding of the trial judge. See *McCarson v. State,* 8 Md. App. 20, 257 A. 2d 471 and *Edwards v. State,* 7 Md. App. 108, 253 A. 2d 764. We will review

the question for the guidance of the trial judge on retrial.

The evidence concerning the voluntariness and admissibility of the statement was given by two police officers, Detective Sergeant Sterling Fletcher and Detective Edward Chlan.

Fletcher testified appellant was advised of his rights in the following manner:

> "Q. All right. Would you explain what you said to the defendant at the time you advised him?
>
> "A. Yes, sir. I said he has an absolute right to remain silent; that anything he' writes or says may be used against him in a court of law; that he has the right to consult an attorney before any questioning; and, a right to an attorney during any questioning; that if he can not afford an attorney that the court will appoint one for him; if he decides to make a statement and wants to stop at any time during the giving of the statement and request the presence of a person, of an attorney, has that right, and no more questions will be asked.
>
> "Q. What did you do after you orally explained this to him?
>
> "A. After I orally explained to him, I handed the defendant the explanations of rights and he read it.
>
> "Q. All right. And what happened then?
>
> "A. Upon his reading it I asked him if he understood it. He stated yes. And I also asked him if he wanted an attorney at this time. He says, no, that he wanted to give us a statement.
>
> "Q. All right.
> And did he give you a statement at this time?
>
> "A. Yes, sir, he gave us a verbal statement at that time."

Fletcher stated they used no promises, threats or coercion. Before appellant made his oral statement, the officers told him they had the murder weapon. After appellant's oral statement, the police told him they had a signed statement from Smith saying appellant was the murderer. After being told this, appellant agreed to a written statement, which Fletcher typed as the appellant dictated it. Appellant read and signed the statement which was witnessed by Fletcher, Chlan and another officer. Officer Chlan's testimony was substantially the same as Fletcher's.

Although the police did have a gun in their possession, no ballistics tests were possible to indicate that gun was the murder weapon, and Smith had made no confession.

Appellant first contends that the statement he gave the police violated *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694. Specifically, he contends: (a) that the State did not show appellant understood his rights sufficiently to waive them knowingly and intelligently; and (b) that the State did not indicate to appellant that he was entitled to a lawyer prior to any questioning and that if he could not afford one, the court would appoint one.[1]

The record shows appellant both understood his rights under *Miranda* and knowingly and intelligently waived them. This record is not a silent one within *Wiggins v. State*, 4 Md. App. 95, 107, 241 A. 2d 424 n. 7 as appellant contends; there was a full compliance with the principles discussed in *Brown v. State*, 3 Md. App. 313, 320, 239 A. 2d 761. As to part (b), the testimony shows that appellant was told of his right to consult a lawyer before any questioning, and of his right to the presence of a lawyer before answering any questions or at any time while being questioned, and that if he could not afford

1. In addition, he contended that the police deceived appellant into confessing by telling him that they had evidence which they did not in fact have. The contention was waived at oral argument; hence, it will not be discussed. However, see 99 A.L.R.2d 772 and *Frazier v. Cupp*, 394 U. S. 731, 89 S. Ct. 1420, 22 L.Ed.2d 684 (1969) for a discussion of the principles involved.

an attorney one would be appointed for him. We cannot say the trial judge was clearly erroneous when he admitted the statement.

## II   Perjured Testimony

Appellant next contends that it was reversible error for the State's Attorney to knowingly allow a perjured statement by a witness to go uncorrected. The statement referred to was the offer to Thomas Wallace, a codefendant under these indictments of a "deal" under which, in return for testimony against appellant, Wallace would be allowed to plead guilty to common law robbery and all other charges, including murder, would be dismissed.

As long ago as *Mooney v. Holohan,* 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935) the Supreme Court decided, without much discussion, that an accused was denied due process of law if a state prosecutor knowingly used prejured testimony to secure his conviction. This Court has, of course, adopted this principle. *Lyde v. Warden,* 1 Md. App. 423, 230 A. 2d 695, *McCoy v. Warden,* 1 Md. App. 108, 227 A. 2d 375. As recently as *Napue v. Illinois,* 360 U. S. 264, 79 S. Ct. 1173, 3 L.Ed.2d 1217 (1959) the Court held that the same principle applied when the evidence was merely impeaching evidence, *i.e.,* where the prosecutor failed to correct an accomplice's false testimony that he had received no promises of favored treatment by the prosecutor in return for his testimony.

The rule is stated in 3 Wigmore, *Evidence* § 967 (1964 Supp.) as follows:

"If, upon cross-examination, witness for the prosecution falsely denies, to the knowledge of the prosecuting attorney, expectation of consideration in return for his testimony, it is the duty of the prosecuting attorney to inform the trial Judge about the matter.
"Federal: 1960, *United States v. Bishop,* D.C.E.D. Wis., 188 Fed. Suppl. 804, 807 (*Napue v. People of State of Ill.,* 360 U. S. 264, 79

Sup. Ct. 1173, 3 L.Ed.2d 1217, quoted and applied in lucid opinion by Grubb, D.J.).

"New York: 1956, *People v. Savvides,* 1 N.Y.2d 554, 136 N.E.2d 853 (excellent opinion by Fuld, J.; see Comment, 32 N.Y.U.L.R. 607).

"Although accomplice first testified that no promise had been made to him by the prosecution, his subsequent testimony of repudiation armed the jury with sufficient information to evaluate his testimony. But with this ruling the United States Supreme Court disagreed. 360 U. S. 264, 270, 79 Sup. Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221."

The Supreme Court of New Jersey in *State v. Taylor,* 49 N. J. 440, 231 A. 2d 212, 221 stated the rule most forcibly:

"It should be pointed out here that there is nothing unholy in honest plea bargaining between the prosecutor and defendant and his attorney in criminal cases. At times, it is decidedly in the public interest, for otherwise, on occasion the guilty would probably go free."

\* \* \*

"When pleas are negotiated, the important purposes to be served are fairness to the pleading defendant and to the public, and where one consideration for the plea is an agreement by a co-defendant to testify truthfully for the state against another defendant, in return for a recommendation of leniency by the prosecutor, such promise or understanding should be fully, fairly and honestly disclosed when it comes into question at the trial. In the present case that was not done, and the failure to disclose the promise to recommend leniency infringed on Taylor's right to a fair trial. Accordingly his conviction cannot stand. It is reversed and the cause remanded for a new trial."

For other recent cases supporting the same principle see *Miller v. Pate*, 386 U. S. 1, 87 S. Ct. 785, 17 L.Ed.2d 690, *Wolfe v. Florida*, 190 So. 2d 394 (Fla. Dist. Ct. App.), *People v. Lueck*, 24 Ill. 2d 554, 182 N.E.2d 733. The latter two cases make clear that the error is not waived by reason of appellant's counsel's knowledge of the perjury at the time of the trial.

We think the principle under discussion applies to the facts of the instant case and a prosecutor would be naive, to say the least, if he really believed an attorney could secure his client's testimony against a codefendant without in some manner, directly or indirectly, communicating the prosecutor's promise to the witness.

The Attorney General argues that the error was harmless.

In *Barbee v. Warden*, 331 F. 2d 842 (4th Cir.) the Court stated that a conviction would be reversed regardless of actual prejudice where a prosecutor knowingly used false testimony to secure a conviction, but we think the Supreme Court in *Napue v. Illinois, supra,* indicated to the contrary. In more recent cases involving other constitutional questions relating to the fairness of a trial, the Court has held some constitutional errors can be harmless, *Harrington v. California*, 395 U. S. 250, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969), provided the appellate court can declare its belief beyond a reasonable doubt that the error was harmless. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705. On these facts, we can make no such declaration. While the *corpus delicti* was established by clear and convincing evidence, the sole evidence, other than the accomplices' testimony, *directly* establishing the criminal agency of the appellant was a confession secured at least in part by trickery. While we have held that there was no legal impediment to the admission of the confession, we cannot be certain beyond a reasonable doubt that the testimony of the accomplices, whose testimony had been purchased by promises, was harmless.

### III Sufficiency of the Evidence

In view of the reversal, there is no need for us to discuss the sufficiency of the evidence question beyond saying the appellant's contention is without merit.

*Judgments reversed and case remanded for a new trial.*