## WILLIE GREEN ELDER *v.* STATE OF MARYLAND

[No. 485, September Term, 1968.]

*Decided July 2, 1969.*

The cause was argued before MURPHY, C.J., and AN-
DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Morris Lee Kaplan* for appellant.

*John J. Garrity, Assistant Attorney General,* with whom
were *Francis B. Burch, Attorney General, Charles E.
Moylan, Jr., State's Attorney for Baltimore City,* and
*Barry S. Frame, Assistant State's Attorney for Balti-
more City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

At a court trial which commenced on 7 June 1968 in the Criminal Court of Baltimore the appellant was convicted of the murder in the first degree of Rosina Di-Paula [1] and of assault with intent to murder Concettina DiPaula. He was sentenced to life imprisonment on the murder conviction and to a consecutive sentence of 15 years on the assault conviction. On appeal he contends: (I) The lower court erred in its denial of a motion made by him, and (II) the evidence was not sufficient to sustain the convictions.

I

On 6 November 1967, prior to trial, the appellant filed a petition requesting that he be given a "truth serum test" and the petition was denied the same day by Judge Anselm Sodaro, presiding in the Criminal Court of Baltimore. On 18 December 1967 the State answered the petition and, although alleging that the results of a truth serum test have no probative value in a criminal case in Maryland, that the petition was not supported by reasons as required by Md. Rule 725 (e) [2] and that it did not appear that results of the test could in any way be necessary to the defense, stated that it would not object to the signing of the order requested if at the time of the test both prosecuting attorney and defense attorney were present and if it was agreed that the results of the test would have probative value and be admitted in evidence as an agreed exhibit either for or against the defendant at his trial. On 6 February 1968 the appellant filed a consent and authorization to take the test and to have the results used for or against him at his trial. On 3 May Judge James A. Perrott, presiding in the Criminal Court

1. He was indicted with Alphonso Wiggins for the murder of Rosina DiPaula. Wiggins was tried separately in the Criminal Court of Baltimore, convicted of murder in the first degree at a court trial and sentenced to imprisonment for the balance of his natural life. The judgment was affirmed by this Court on appeal. *Wiggins v. State,* 4 Md. App. 95.

2. The State apparently had reference to Rule 725(c).

of Baltimore, ordered that the test be administered by John Hamilton, M. D., Supervisor of Clifton T. Perkins State Hospital, but preserving the right of the court to rule on the admissibility of the results of the test at the trial "notwithstanding the agreement of the parties." At the trial Dr. Hamilton, called by the defendant but apparently a joint witness by stipulation, testified that pursuant to the order, which he insisted upon before giving the test,[3] he had examined the appellant except that by

3. Asked by the trial court why he required a court order before proceeding with the interview Dr. Hamilton said:

"There are several reasons why, and I'll try to give them in order of priority of importance to me. Number one, the injection of a hypnotic agent or any agent which lessens the level of consciousness in a human being is, as far as I am concerned, a very serious thing and it has been held in various courts in this State and, or course, in various courts in other States, that this represents an unwarranted assault on the body and person of the individual who is injected. I felt that because this was to be done in a State institution rather than under the auspices of my private practice, in order to protect the hospital as well as the staff members who are there, it was essential we receive not only the permission of counsel for the defense and the Defendant, but that we have some Order from the State this be done. * * *

Secondly, it had been a principle in the institution under my administration all such requests had been denied because it is my belief that there is some doubt as to the test providing the information which is sought by the request for such an examination. Succinctly, I mean by that this: It is assumed by various lay people and by people in various other professions that there is such a thing as a truth serum and it is a procedure whereby this might be administered and the 'truth' be determined. Psychiatrically, I am not familiar with this and I felt it would be something less than presumptuous if I were to undertake such an examination with the purpose of providing such information which I felt could not be provided by such an examination."

It was elicited from Dr. Hamilton that he agreed that "evidence obtained by administering a so-called truth telling serum to an accused and then questioning him is inadmissible whether for or against the accused, because of the lack of scientific certainty or dependability of the results." He said: "The test is used as an adjunct. It is a psychologically induced hypnotic situation. It enhances the susceptibility * * * There are enumerable dangers in the use of the hypnotic state. I can elaborate as to each, but the principle ones are that in a suggestible individual it is quite difficult to control the flow of unconscious material and we are always concerned with what will happen to an individual who has certain kinds of unconscious material brought to the surface dur-

agreement it was a sodium amytal interview procedure rather than a truth serum test. Dr. Hamilton conducted two such sodium amytal interviews. The appellant's responses to questions were the same—"that he was innocent, had nothing to do with it, that he was not present at the time of the commission of the alleged offense, et cetera." Dr. Hamilton was not able to determine truth or error. The court said:

"I find myself in this position. I am pretty well estopped from making a ruling because it has been conceded by the State and counsel for the Defendant it was agreed this would be introduced into evidence and for whatever it may be worth, I shall allow it to remain on the record."

Subsequent to the convictions of the appellant, he filed, in proper person, a "Motion for a Private Clinical Physical Hypnotic Examination" to be obtained at State expense. The motion was heard by the court on 27 November. It appeared from argument of counsel that the appellant was not satisfied with Dr. Hamilton's opinion as to the reliability of the test. The motion was denied. It is this denial that the appellant claims was error. The matter is not properly before us. There was no objection by the appellant to the testimony of Dr. Hamilton during the trial, and the issue was not tried and decided below before the verdict was rendered. Md. Rule 1085. Further it appears that the point was argued below as one of the

---

ing the questioning in a hypnotic trance." He agreed that if a person agreed to take the test with certain ideas in mind, it could affect the result of the test. He stated that sodium amytal "is a central nervous system depressant which acts in limited doses as a hypnotic * * * [It] depresses the elements in the central nervous system, neurons, so that they are less susceptible to the controlling inhibitions, influence, the sections which have to do with these controls." But a person in a hypnotic state can "resist the question" asked him. The court inquired: "Dr. Hamilton, based upon your experience as a physician skilled in the practice of psychiatry, can you, with any degree of medical certainty, advance an opinion to the reliability or unreliability, falsity, of statements, which you would obtain by this sodium amytal interview?" Dr. Hamilton answered, "I cannot."

grounds of a motion for a new trial. The general rule is that the granting of a new trial lies within the sound discretion of the trial court and is not reviewable by this Court. *Stallard v. State*, 6 Md. App. 560; *Adams v. State*, 4 Md. App. 135.[4]

## II

Rosina DiPaula, single, age 76 years, and Concettina DiPaula, single, age 71 years were taken to Maryland General Hospital in an ambulance on 4 October 1966. Rosina DiPaula died in the hospital on 12 November 1966. The opinion of the Medical Examiner was that she died of broncho-pneumonia complicating extensive head injuries with brain damage and that the manner of death was homicide. Concettina DiPaula remained in the Intensive Care Ward at the hospital for five weeks, and after a month and a half stay at the hospital came home to live with her brother Joseph DiPaula. At the time of the trial she was "incommunicative."

The DiPaula sisters lived at 1323 West North Avenue, a three story row house, of which the third floor was not occupied. Their brother Joseph DiPaula, whose practice was to stop by to see them both in the morning and after finishing work "to see whether they need anything", visited them at 6:00 P.M. on 4 October. They were in the sewing room working. He ate a dish of soup Concettina prepared for him. She then asked him to cash Rosina's social security check in the amount of $69.80, but he had only $50 which he gave Concettina—"three ten dollar bills, three five dollar bills and five one dollar bills." Concettina put the bills into her apron pocket. Rosina was still upstairs on the second floor doing her embroidery. As he left the house, the inner door closing and locking automatically, about 6:30 P.M., he saw a young man

---

4. The admissibility of the results of the sodium amytal interview procedure or even the admissibility of evidence as to a defendant's willingness or reluctance to undergo a psychological truth test is not presented on this appeal. But see *Lusby v. State*, 217 Md. 191. As to hypnosis see *Harding v. State*, 5 Md. App. 230, note 1, page 245. As to lie detector tests see 95 A.L.R.2d 819, Annot. *Lie Detector Tests—Willingness*.

standing at the door. He had a cap on, glasses and was holding a satchel in his hand and wearing a white jacket with the inscription of the University of Maryland, and was about twenty years of age. He had a brief conversation with the boy; "when I saw his standing there I asked him whether there was anyting I could do for him. His reply was 'No, I don't want any insurance, I got enough.'" When he got home his wife had received a telephone call about his sisters and he went to Maryland General Hospital. "I saw both of my sisters laying on top of the tables, beyond recognition, full of blood and hair full of blood * * * both were unconscious."

On 4 October 1966 about 6:40 P.M. Officer James Osborne and Officer Richard Catania of the Baltimore City Police went to 1323 West North Avenue in response to a call that a burglary was being committed at that address. The vestibule door to the house was closed but not locked. The second door which leads into the house was partly ajar, with the hinges off. They entered and found Concettina DiPaula and Rosina DiPaula in the hallway, each bleeding profusely. "It appeared to me these women were hit with some kind of sharp instrument." The police heard a noise in the back, then heard some shots, and then worked themselves "from one room to another, one at a time, make sure nobody in the house." They heard a lot of running, saw one figure "somebody in a white top" and they gave chase. When they heard police in car 704, who had subsequently arrived at the rear of the house, chasing them, they ran back into the house to call an ambulance. There was blood from where the sisters were found on the first floor all the way to the sewing room on the second floor. The entire house had been ransacked, —doors and drawers pulled open, a mattress on the third floor turned over, covers in disarray, papers strewn about, clothes taken from closets and discarded on the floor. Officer Wayne McKenna of the K-9 Corps testified that on 5 October 1966, after receiving information from various people in the 1300 block West North Avenue, went to the alley in back of a house located at 2332 Etting where

there was a wall roughly six feet high. On top of the wall he found a pocketbook in which were some "holy papers" and a doctor's appointment card. Beside the pocketbook, he found a prayer book, a key and some change. The pocketbook was subsequently identified as belonging to Concettina DiPaula.

Rudolph Matthews, age 15 years, was with Antonio Vega, Lee Cephas, Jerome and Edward Wells at Buddy Boy's Pizza Shop, located at Pennsylvania and Lafette Avenues, at about 5:00 P.M. on 4 October 1966 "listening to records and dancing" when the appellant and Wiggins came in. Appellant then said "he was going to make a hustle", meaning, in the witnesses interpretation, "Rob somebody." The appellant had brass knuckles. Matthews left Buddy Boy's a little after five in the company of the appellant, Cephas, Vega and Wiggins, walking on Pennsylvania Avenue up towards North Avenue, leaving the group at Pennsylvania and North Avenues to proceed to his home. He saw the appellant the next day with Wiggins playing dice. The appellant told him "he made a hustle." He saw the appellant put a $5 bill in the middle of the crap game.

Gary Lee Cephas, 15 years of age, testified that he, Wiggins and Vega were at the City Food Market on the day of the crimes and were watching two women, about 70 and 80, getting change. They then went down to a lunchroom located on Pennsylvania Avenue where they met the appellant. They all then went to the women's house. Vega went to see if the door was open, but when he got to the door, a "man came out the door and Tony went down to the corner, make a phone call and the man followed him." The man, about 67, started to argue with Vega at the phone booth located at the corner of North Avenue. The witness, appellant and Wiggins were at this time "pushing on the front, first door and broke in the second door" and then they "seen this woman hollering, talking about get out of her house." When she started screaming, Cephas and the appellant hit her, appellant's

blows hitting her in the face. Cephas searched in the kitchen and the living room, appellant and Wiggins went upstairs "five or ten minutes after we got in the house." Cephas found $50 in the lady's apron. While he was downstairs he heard a woman's voice, but he didn't pay much attention. Appellant was carrying a cigar box when he came down the steps. They then went out the back door. He heard the police "hollering stop" and Wiggins took a blank gun and fired two shots and they all ran to a house on Brunt Street, about five to eight blocks away, where they went down the basement. Wiggins started counting the money, giving him $11. Vega subsequently came down the basement. Cephas did not know what was in the box appellant took. He further stated that he saw the appellant at "his girlfriend's house" the next day.

Antonio Vega, age 14 years, was with the appellant, Wiggins and Lee Cephas about 5:00 P.M. on 4 October 1966 at Buddy Boy's Sub Shop on North Avenue. Wiggins told him "Let's go make a hustle." Vega said, "No." "He said, 'Why don't you stop acting like a little chump?' I didn't say nothing. He started calling me names, stuff. So I was going with him." They went on North Avenue and saw "these ladies in the City Food Market with some change." Appellant suggested they snatch a pocketbook but Vega said he did not want to do that. They didn't get the pocketbook because when the ladies came out of the market they went across the street and went in the house. Appellant and Wiggins then said that "they was going in the house and get it." Vega declined to do this and the others asked him to watch for them. He agreed. Then "a man came out of the house, went across the street, came up to me * * * asked me did I want insurance." Wiggins, Cephas and appellant entered the house in that order. "After they went in and after a while I heard some lady scream." Vega further stated that the man who asked him about insurance went down to the phone booth. Then he heard the police coming. He hollered "police" and ran up North Avenue. He heard shots. He ran to a house on Brunt Street and peeped down the cellar. He saw Wig-

gins and the appellant. When he came down the cellar, "Willie June (appellant) had some rings and earrings and Lee (Cephas) had money and Lee had a pipe against the wall. Willie June handed Wiggins some knucks (brass knuckles)." Lee's hand was bleeding. "He wiped his hand on my jacket and left it down the cellar." He heard the appellant say, "We got the ladies and you got the stuff and we still get to divide even." On redirect examination, Vega stated that he was talking to the insurance man "three or four steps from the house."

The appellant, testifying in his own behalf, denied participation in the crimes. His testimony was that he was elsewhere when the crimes were committed.

The contention as to the sufficiency of the evidence as presented by the appellant goes only to his criminal agency and not to the *corpus delicti* of the crime. His criminal agency was established by the testimony of Cephas and Vega, but it is clear that they were accomplices. The testimony of accomplices is not sufficient to sustain a conviction unless corroborated. *Burley v. State,* 5 Md. App. 469. Not much in the way of corroboration is required; it is not necessary in and of itself that the corroborative evidence be sufficient to convict. *Wright v. State,* 219 Md. 643. However, it must support material facts which tend to show that the accused was either identified with the perpetrators of the crime or had participated in the commission of the crime itself. *Boone v. State,* 3 Md. App. 11, 19-20. Whether testimony of accomplices had in fact been sufficiently corroborated must, of course, depend upon the facts and circumstances and the inferences deducible therefrom in each case.[5]

In the instant case it appears that the required corroboration of the testimony of the accomplices can only be from the testimony of Matthews for neither the tes-

---

5. For cases in which the corroborative evidence tended to identify the defendant with the perpetrators of the crime, with the defendant's participation with the crime itself, and with both the perpetrators and the commission of the crime see *Boone v. State, supra,* note 4 at p. 20.

timony of the other witnesses nor other evidence in the case supplied it. The corroboration was supplied by the testimony of Matthews that on the afternoon of 4 October 1966 about 5:00 P.M. he saw the appellant in Buddy Boy's Pizza Shop with Vega, Cephas and Wiggins. The appellant said he was going "to make a hustle." Asked how he used the term "hustle", he said, "When you are going to get some money." Asked, "In what particular way?", he replied, "Rob somebody." The appellant had brass knuckles. The appellant, Cephas, Vega, Wiggins and Matthews left the shop, which was located at Pennsylvania and Lafayette Avenues, and went up Pennsylvania Avenue towards North Avenue. Matthews left them at Pennsylvania and North Avenues and went home. He saw the appellant again the next day on Brunt Street. Wiggins was with the appellant and they were shooting dice. The appellant said that they had made a hustle and he "thought he got caught." The stakes in the game were "bills, dollar bills", and a five dollar bill was by the appellant. On cross-examination he said the appellant was putting the money in the "middle." The testimony that the appellant was in the company of Wiggins, Cephas and Vega shortly before the commission of the crimes and in the company of Wiggins the day after the crimes, in the circumstances, tended to show that the appellant was identified with the perpetrators of the crimes. The following testimony of Matthews corroborated the testimony of the accomplices by tending to show that the appellant had participated in the commission of the crimes:

1) the appellant's statement shortly before the commission of the crimes that he was going to make a hustle;
2) the appellant's statement the day after the crimes that they had made a hustle;
3) the appellant's statement that he thought he got caught in the light of the accomplices' testimony of the arrival of the police and the events which then took place and the police

officers' testimony that when they were at the scene of the crime they heard someone running in the house and gave chase;

4) that the appellant was shooting craps in which the stakes were bills and that he put a $5.00 bill in the "middle" in the light of the accomplices' testimony as to the dividing of the loot, Joseph DiPaula's testimony as to the money he had given his sister Concettina which was stolen and the appellant's testimony on cross-examination that he was not working at the time the crimes were committed and that although his mother had given him $30 on 3 October — "my mother draw security"—he had purchased a pair of pants for $29 on that day; [6]

5) the appellant's possession of brass knuckles in the light of the nature of the injuries to the victims and Cephas' testimony that the appellant struck Concettina DiPaula in the face.

We find that the testimony of Matthews corroborated the testimony of the accomplices within the purview of the rule and that the evidence was sufficient to sustain the conviction. The trial court was not obliged to believe the denials or explanations or alibi of the appellant. *Fletcher and Smith v. State*, 6 Md. App. 219. And even if the evidence as to the sodium amytal interviews was improperly admitted in evidence, the appellant received more than that to which he was entitled and was not prejudiced thereby. In any event, the weight to be given such evidence was a matter for the trier of fact. *Felder v. State*, 6 Md. App. 212. The judgments of the trial court on the evidence were not clearly erroneous and we may not set them aside. Md. Rule 1086.

*Judgments affirmed.*

---

6. He later said he did not get the pants but used the money for drink. He did not know how much he had left but the next day his fiancee gave him $10.