# ELWOOD LEROY LEUSCHNER v. STATE OF MARYLAND

[No. 945, September Term, 1979.]

*Decided April 14, 1980.*

324

The cause was argued before Lowe, Couch and Weant, JJ.

*Patricia A. Logan, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Richard D. Warren, State's Attorney for Wicomico County,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

Elwood Leroy Leuschner was a multiple offender felon who came to Maryland as a fugitive from California justice. His atrocities there were of such nature that his wife by petition alleged him to have been a sexual psychopath causing his commitment to the Mendocino State Hospital which, after 90 days, decided he was not so deranged. Violating his parole after imprisonment, Leuschner emigrated to Maryland where he subsequently kidnapped, sodomized and murdered two young boys, 10-year-old Russell Marine by stabbing and 9-year-old Troy Krause by strangulation.

Despite the attendant violence of crimes of that nature, they are nonetheless clandestine. The witnesses are dead, most physical evidence hidden or destroyed and the only living knowledge of it is locked in the mind of the perpetrator. Though he may be suspected because of his past, he cannot be reapprehended for prior crimes; nor can he be deterred from committing future ones of like nature unless law enforcement officials can somehow discover his misdeeds. The obvious, usually the best, and often the only source, is the perpetrator himself and if a confession can be extracted properly, prosecution and subsequent confinement are reasonably assured.[1] But if that route is followed,

---

\* Note: *Certiorari* denied, Court of Appeals of Maryland, July 3, 1980.

1. "[A]dmissions or confessions ... when voluntarily and freely made, have always ranked high in the scale of incriminating evidence ...." Brown v. Walker, 161 U.S. 591, 596 (1896).

officials must tread carefully lest they trespass upon an accused's constitutionally sacred grounds; that which provides him the privilege not to "be compelled in any criminal case to be a witness against himself . . . ." U. S. Const. amend. V.

To the extent that this privilege intrudes upon the investigatory aspect of criminal law enforcement, the privilege of silence serves as a checkrein, but not necessarily an unjustifiable restraint, upon police. Even the sanction for involuntarily extracting statements — evidentiary exclusion — is not an unreasonable one in light of the questionable truthfulness of that which was, or might be, coercively extracted by physical or psychological means. However, as the Fifth Amendment right has been interpretively extended, requiring procedural niceties of interrogation formulized to fit precise patterns, it has more and more become an impediment even to legitimate methods of law enforcement. See Harlan, J., dissenting in *Escobedo v. Illinois,* 378 U.S. 478, 493 (1964).

One such nicety was the blending of the Fifth Amendment right not to speak, with the Sixth Amendment right "to have the Assistance of Counsel for [one's] defense". Initially, the right to counsel for one's defense presupposed an advocate at trial, but was interpretively extended to apply pretrial for an indicted defendant interrogated by the police in a completely extrajudicial environment. *Massiah v. United States,* 377 U.S. 201 (1964). Perhaps because the exclusionary rule was found to be an effective deterrent to opprobrious police conduct in violation of the Fifth Amendment, any statement elicited in the absence of counsel after indictment, regardless of how elicited, was not admissible at trial against the accused. *Ibid.* Soon to follow *Massiah* was *Escobedo v. Illinois,* 378 U.S. 478 (1964), which extended the right to counsel to a suspect — not necessarily indicted — but from the moment the investigatory phase of an interrogation becomes accusatory and focused upon the suspect.

"[Where an] investigation is no longer a general inquiry into an unsolved crime but has begun to

focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 US [335 (1963)], at 342, 9 L ed 2d at 804, 93 ALR2d 733, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." *Escobedo v. Illinois,* 378 U.S. at 490-491.

*Escobedo* thus interwove the two rights, binding them together with the sanction of exclusion. The final touch to this pattern of protection was *Miranda v. Arizona,* 384 U.S. 436 (1966), which provided the striated brocade of procedural niceties.

*Miranda*'s holding first appears as simplicity itself,

"... the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444,

but it was the "procedural safeguards" that striated the holding.

"Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or

appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444.

The Fifth Amendment safeguard was abundantly clear, but that paragraph also suggested that to exercise the Sixth Amendment right to counsel might be a talisman serving to raise the Fifth Amendment shield as well.

"If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-445.

The Court then jumps back to the Fifth Amendment.

"Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id.* at 445.

Then, presumably because of the application of the similar sanctions, the Court speaks as if the Fifth Amendment privilege and the Sixth Amendment right are one and the same,

"The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right [Fifth] to refrain from answering any further inquiries *until he has consulted with an attorney [Sixth] and thereafter consents to be questioned [Fifth]." Id.* at 445 (emphasis added),

and seems to say that a subsequent waiver must be a knowing and intelligent one.

For 45 pages after its initial deceivingly simple holding, the Court sought to explain what was meant, apparently trying to anticipate all situation possibilities of which it could conceive. Again it alternately addressed the right and

the privilege in a single paragraph. With regard to the Fifth Amendment privilege not to speak, it said:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody · interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473-474 (footnote omitted).

In the same paragraph it anticipated the exercise of one's Sixth Amendment right to the assistance of counsel.

> "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. · "*Id.* at 474.

Then it concluded those examples with the third possibility, an amalgam of the two.

> "*If* the individual cannot obtain an attorney *and he indicates that he wants one before speaking to police,* they must respect his decision to remain silent." *Id.* at 474 (emphasis added).

But, contrary to some interpretations, even if both rights are exercised by one upon whom an investigation has focused, the Court did not by that fact alone command the investigators to *cease* all interrogation. It does, however,

place upon them a heavy burden if they wish to use in trial that which they elicit thereafter —

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475.

And the *Miranda* Court went on to make unequivocally clear that mere silence is not enough to overcome that heavy burden. *Id.* at 475.

Now, after more than a decade of experience, the Court in *North Carolina v. Butler,* 441 U.S. 369, 60 L. Ed. 2d 286, 292 (1979), explained that the heavy burden of proving a waiver need not be restricted to an express waiver by a defendant, but may be inferred by strong evidence of the circumstances of the interrogation.

"That [waiver may not be inferred by a silent record] does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

With these questions of constitutional rights at issue in the case before us, we have independently and carefully reviewed the entire record, *Walker v. State,* 12 Md. App. 684, 694 (1971). Silent it is not. Unlike the record in *Tague v. Louisiana,* 444 U.S. 469, 62 L. Ed. 2d 622 (1980), the record here fairly shouts at us, as it did to the trial judge, that this case is one from which "waiver can be clearly inferred from the actions and words of the person interrogated." *Butler,*

*supra* at 292. In so concluding, we scrupulously followed the directive of the Supreme Court which stated in *Butler, supra,* that

> "when the right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the *background, experience, and conduct of the accused.*' " *Id.* at 293 (emphasis added).

— *Butler's* variations on the *Miranda* theme —

Elwood Leroy Leuschner was convicted in the Circuit Court for Washington County of murdering and sexually offending Troy Krause, a 9-year-old boy. He had previously been convicted in Wicomico County of similarly destroying 10-year-old "Rusty" Marine. See *Leuschner v. State,* 41 Md. App. 423 (1979). Having exhausted his appeals in the Marine case, his appeal now is from the Krause conviction. Both cases rested upon Leuschner's confessions which were elicited almost simultaneously. His assertions of improprieties in eliciting the confessions compel us to review the entire circumstances and events leading up to both confessions. Following the *Butler* directive, however, we must first consider him with whom we are dealing.

*"background, [and] experience"*

Elwood Leroy Leuschner, as we have indicated, has a "background" and "experience" which show, by repetitive exposure, an assimilated knowledge of judicial proceedings and defendant's rights. In California, as indicated by a four page criminal record, he had been charged with two crimes against children, two rapes, assault and robbery, firearms violation, forgery, burglary, and was a registered sex offender who had been accused but not proven to have been a sexual psychopath. Such background implies a knowledge, whether gained from books or experience, that is a distinguishing circumstance to be considered in determining

whether his subsequent conduct was an intentional waiver of a known right. *Cf. Escobedo, supra* at 491-492.[1A]

*"conduct of the accused"*

For three months the Maryland State Police in Wicomico County had been searching for a missing 9-year-old boy named Troy Krause, when in late October of 1977, another youngster about the same age, named Russell (Rusty) Marine was reported missing also. On October 29, 1977, while investigating Rusty's disappearance, the State Police were told by Rusty's stepfather that his neighbor, Elwood Leroy Leuschner (the appellant) had last seen Rusty walking down the road toward a dirt pile near their residences. Trooper David Luce went to Leuschner's trailer home and inquired about his recollection of last seeing Rusty. Because Leuschner's niece had previously related that Leuschner had a California criminal record, the trooper, upon returning to the barracks, entered Leuschner's description in a National Crime Information Center Computer and found that he was wanted in California for a parole violation. His criminal record was four pages long.

On October 30, 1977, in the early morning hours Leuschner was arrested (because California would extradite on the outstanding warrants for parole violation) and immediately advised of his rights, which he admittedly understood. He explained to the police that

> "he had been communicating with California authorities in an attempt to get his parole problem straightened out, that he only had one more year left on his parole."

Upon arrival at the State Police barracks he was again informed of his *Miranda* rights and at that time

> "Mr. Leuschner stated that he wanted an attorney

---

**1A.** Underscoring appellant's legal acumen is a handwritten, well organized and perceptive "Supplemental Brief" submitted to his appellate attorney along with a critique of that counsel's brief as previously filed. While there is no provision in our law recognizing the right to file a per se brief supplementing an already filed obviously competent and indeed superior brief by counsel, we acknowledge it as supporting our determination from the record that Mr. Leuschner is legally knowledgeable and practically sophisticated in the judicial processes.

*to represent him on the fugitive charges,* as he did not want to go back to California; he had a lot to lose: he would lose his trailer, his job, his girlfriend, and so on." (Emphasis added).

No questions were asked of him regarding the fugitive charge; however, he was routinely processed and subsequently taken to the Criminal Investigator's office. There he was questioned

"concerning any information he may have [had] as to the location of the missing boy, Rusty Marine."

It is significant to note that his previous request for an attorney was expressly in regard to the fugitive charge only. That request for counsel was "scrupulously honored" as a triggering mechanism for his "right to cut off questioning" in regard to the charge for which he was arrested; however, he willingly agreed to discuss the missing boy. See *Michigan v. Mosley,* 423 U.S. 96 (1975).

"Q. Did he say anything to you about an attorney at that time?

A. Just for the fugitive charge.

Q. What do [you] mean? What did he say?

A. He said he would like to have an attorney represent him for the fugitive charge, because he did not want to go back to the State of California.

Q. Did he indicate to you at that time whether or not he was willing to talk to you about Rusty Marine?

A. Yes, sir. He was willing, and he stated that he would be perfectly willing to talk to us; that he didn't have any information concerning the location of where the missing person was.

Q. What, if anything, did he tell you concerning an attorney with respect to talking to you about Rusty Marine?

A. He did not [sic [2]] say he did not desire an attorney; he didn't need one.

Q. Did he say that?

A. Yes, sir, he did."

No questions were asked of Leuschner as to Troy Krause. The sole concern was directed to the missing neighbor Rusty since Leuschner was the last to have seen him. Presumably, little if any connection was known between Leuschner and Troy.

During this time, Betty Larmore, the paramour with whom appellant resided, came in and was permitted to be with, and talk to, Leuschner. Leuschner relayed his request for the retention of counsel to her.

"Q. What, if anything, did they talk about?

A. Mr. Leuschner requested that Betty Jean obtain an attorney for him.

Q. Did he indicate to her why he wanted an attorney?

A. Yes, sir, because he did not want to go back to California; that they would have too much to lose.

Q. What, if any, response did Miss Larmore give him at that time?

A. At that time she said that she couldn't do anything about getting an attorney due to the day it was.

Q. What day was it?

A. That was Sunday. However, she would go the next day and attempt to get him one. I believe, I was answering the telephone, but I believe at that time a piece of paper with an attorney's name was written down and given to Miss Larmore.

---

2. It is apparent from a contextual reading of the record that the word "not" was inadvertent either on the part of the witness or the stenographer. The meaning was abundantly clear and expressed elsewhere that Leuschner did not want an attorney for any purpose except the fugitive charge.

Q. By whom?

A. By Mr. Leuschner.

Q. Other than passing the piece of paper to Miss Larmore, did Mr. Leuschner respond in any way to her indication that she would be unable to do anything about an attorney until the next day?

A. No, sir."

With M's Larmore still there, the conversation to determine the whereabouts of the missing Rusty resumed. Discrepancies from Leuschner's previous interviews became apparent but nothing incriminatory or accusatory with regard to Rusty was elicited. Cigarettes, sandwiches and coffee were provided Leuschner around 4:00 o'clock. From that time until 6:00 or 6:30, Lt. Keating, who was called in to

". . . assist in the investigation of a missing person named Rusty Marine",

participated in the inquiry with the help of TFC Milton Hall. They were also familiar with the missing Krause boy, but again the focus of investigation was only upon Rusty. Out of an abundance of caution, prior to any discussion, they too advised appellant of his *Miranda* rights. Leuschner never indicated a desire to stop talking about Rusty; but about an hour after Lt. Keating arrived, he recalled that

"Mr. Leuschner said 'I would like to have an attorney'."

Although the police were not yet aware that either of the boys had been criminally abused,[3] Lt. Keating again

---

3. Until the next day the police did not know if the boys were alive or dead, safe or sound, restrained or free, or simply run-a-ways. The police were simply seeking information about one of the boy's whereabouts from the last person known to have seen him. Although it is apparent that the police had more than a passing interest in Leuschner and obviously had some suspicion that he was not disclosing all he knew about the missing Rusty, in a criminal sense he was not focused upon as an accused. Escobedo v. Illinois, 378 U.S. 478 (1964). Had Leuschner not been lawfully in custody as a fugitive, he could not have been held or charged as an accused in the absence of some probable cause by the police to believe he had committed a crime. While one may be a suspect in an investigatory sense, he could

choosing to err, if at all, on the side of prudence, immediately acquiesced:

> "Q. What, if anything, did you do when he said that?
>
> A. He was sitting right next to the telephone, and I advised him: 'Mr. Leuschner, there's a telephone. You can call an attorney, or I'll call one for you.' [4]
>
> . . .
>
> A. The telephone was within arm's reach of him, sitting on the desk.
>
> Q. Did you make any comments to Mr. Leuschner about the telephone?
>
> A. Did I make any?
>
> Q. Yes.
>
> A. I told him that he could use the telephone to call an attorney, or I would call one for him.
>
> Q. Did he make any effort to use the telephone?
>
> A. No, sir.
>
> Q. Did he ask you to call an attorney for him?
>
> A. No, sir.

---

hardly be focused upon as an accused until a crime with which he might have been connected is known to have been committed — by someone.

But we are reciting the "particular facts and circumstances" upon which waiver must be decided if a criminal investigation *had* begun to focus on the accused. We will continue selectively to set out the testimony of what transpired, keeping in mind, however, the "fact" that there is as yet no crime known to the police as to either boy — there not having even been a question asked regarding Troy. Consequently, appellant's Sixth Amendment right "to have the Assistance of Counsel for his defense" had not come to fruition.

4. It should be noted that no case has as yet placed the burden of *providing* counsel upon the police. It is the denial of a request to permit an accused to contact counsel that violates the constitution, Crooker v. California, 357 U.S. 433 (1958), and Lt. Keating obviously provided ample opportunity and assistance to effect that purpose. Nor is there a per se rule as appellant would urge upon us that the police must terminate any contact with an accused unless counsel is present, once a request for counsel is made. Michigan v. Mosley, 423 U.S. 96 (1975). It is unlikely that Maryland would follow the dissent in Mosley, as urged by appellant, since Maryland does not go that far even *after* indictment. State v. Blizzard, 278 Md. 556 (1976), but see Brewer v. Williams, 430 U.S. 387 (1977).

> "Q. Did he make any effort to use the telephone directory?
>
> A. No, sir.
>
> Q. What, if anything, occurred after you advised him that he could use the telephone?
>
> A. He said he wanted to talk to Betty."

Betty Larmore was in the next room and was immediately brought in. Appellant voluntarily continued his conversation without the instigation of any further questions being asked by the officers.

> "Q. How long did he talk to Betty Larmore?
>
> A. Fifteen, twenty minutes.
>
> Q. Were you present in the room when he talked to Betty Larmore?
>
> A. Yes, sir.
>
> Q. Do you know what they talked about?
>
> A. When she came into the room, I didn't get all the conversation, but he did ask her if she would contact an attorney or had she contacted an attorney.
>
> Q. Do you recall what she responded?
>
> A. No, I don't believe I can say what she said. She might have mentioned the name of an attorney, but I'm not sure."

Although Trpr. Hall's testimony indicated that

> ". . . he did not desire to talk any further; he wanted to contact an attorney",

Lt. Keating's testimony was clearly and pointedly that he did not express any desire to terminate the inquiry,

> "Q. Did he ever at any time during that two or two and a half hours indicate at any time a desire to cut off questioning?
>
> A. No, sir.",

but neither did he express a desire to continue. He simply kept right on talking.[5]

> "Q. After he talked to Miss Larmore, what, if anything, occurred?
>
> A. He just kept carrying on general conversation.
>
> Q. With whom?
>
> A. With Trooper Hall and myself, and Betty was in there.
>
> Q. How did the conversation get started?
>
> A. He just kept talking that he didn't know anything about Rusty Marine.
>
> Q. How long a period of time transpired from the time he stated that he would like an attorney to the point where he started talking again?
>
> A. The conversation never stopped. It was just a continuous conversation with Betty when she came in, and he'd speak to myself or Trooper Hall.
>
> Q. Did the conversation get back to the subject of Rusty Marine?
>
> A. Yes, sir.
>
> Q. Did it ever leave the subject of Rusty Marine?
>
> A. No, sir.
>
> Q. Between the time that Mr. Leuschner stated that he would like an attorney and the next time that he said anything to a Police Officer, did either you or Trooper Hall or any other Police Officer ask him any questions?
>
> A. No, sir."

But perhaps because of the discrepancies in Leuschner's narrations, Trpr. Hornung, who was also participating in the search for Rusty, asked Leuschner

> ". . . if he had any knowledge of the whereabouts of

---

**5.** Whether or not appellant expressly exercised his Fifth Amendment privilege as well as his Sixth Amendment right, the trial judge believed the testimony that no further questions were asked, and we find no reason to believe the contrary.

Rusty, and at one point in the conversation I asked him if he would be willing to take a polygraph.

Q. About what time of day was that?

A. That would have been some time after 7:30 p.m.

Q. What, if any, response did he make to your suggestion concerning the polygraph?

A. He said that before he would submit to a polygraph examination he would have to discuss it with an attorney.

Q. Did he indicate why?

A. No, he just said that he did not . . . it was not his desire to take a polygraph without first consulting with an attorney."

As a consequence nothing more was said to him about such a test.

"Q. Did you say anything further to him at that time or thereafter concerning a lie detector test?

A. No, sir."

And the day concluded by appellant being taken before a district court commissioner for charging on the fugitive warrant where once again he was provided his *Miranda* warnings.

These were the references made by appellant expressing a desire for counsel. In the first instance he restricted his request solely to the fugitive charge and volunteered to help with the search for the missing boy, Rusty Marine. The officers honored the second more general request by refraining from questioning further and by offering assistance in procuring counsel. Appellant, instead of accepting the officers' assistance, preferred to talk again with Betty whom he had commissioned to get him counsel for the fugitive charge which she expressed an inability to do because it was the Sabbath. Prognosticating this precise possibility, it will be recalled, *Miranda* said:

"If the individual cannot obtain an attorney *and* he

indicates that he wants one before speaking to police, they must respect his decision to remain silent." 384 U.S. at 474 (emphasis added).

But Leuschner did *not* indicate that he wanted counsel before speaking further to the police. On the contrary, without any prompting, appellant's continued conversation of the subject under inquiry, both to Betty Larmore in the presence of the police and to the police, belied any inference that he was exercising his Fifth Amendment right. As in *North Carolina v. Butler, supra,* there was no doubt that appellant had been adequately, effectively, and frequently apprised of his rights; the only question was whether his conduct waived them. The test was first espoused in *Carnley v. Cochran,* 369 U.S. 506, 516 (1962), and quoted in *Miranda,* 384 U.S. at 475.

> " 'The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' "

Here, as in *Butler,* the actions and words of the appellant clearly implied a knowing and intelligent waiver of the rights of which he was repeatedly advised and from his extraordinary past experience must have been keenly cognizant.

Having found so clear a waiver of counsel, we note in passing that it is questionable whether Leuschner was entitled to counsel (regarding the missing Marine boy) at the time of his request. Throughout that entire day there was no crime known for which Leuschner could have been focused upon as a suspect. The Sixth Amendment right is a right of an accused, at least in jeopardy of a portending criminal proceeding. *Escobedo* extended the right from one formally accused (*Massiah, supra*) to one focused upon as a suspect. No case has yet provided the right as constitutionally available upon a missing person inquiry, absent knowledge that a crime has been committed. If that were the law, not only

would legitimate methods of criminal law enforcement be "unjustfully fettered" (as concerned Justice Harlan in *Escobedo*), public protection would, in manacles and leg irons, be itself imprisoned. But even if he were entitled to counsel in regard to the missing Rusty Marine, presumably even the police had made no connection between Leuschner and Troy Krause; no suspicion was expressed or indicated by even a single question.

It would be judicially naive to infer that the police had not focused their attention upon appellant in regard to Rusty, especially in light of Leuschner's record; however, the investigation could hardly turn accusatory, even as to Rusty, until some knowledge that a crime has been committed is apparent to the police. That precise point

> "when the process shifts from investigatory to accusatory ... our adversary system begins to operate . . . ." *Escobedo, supra* at 492.

*psychological stimulation or psychological coercion*

The next day, Monday, October 31, 1979, appellant was brought from the jail where he had been confined as a fugitive, back to the barracks for further questioning. He was advised of his *Miranda* rights which he acknowledged having previously heard and that he understood them. During this interview Lt. Keating was advised that Rusty Marine's body had been found.

Leuschner was told but, still indicating that he didn't know anything about it, expressed disbelief. Perhaps to convince him,

> "[w]e talked it over, Sgt. Luce and myself, and it was my opinion that Mr. Leuschner didn't believe anything we were telling him, and I thought if we took him down there and showed him that the body had been recovered, then he'd know that we knew what we were talking about or telling the truth";

perhaps because now the commission of a crime by someone had surfaced and suspicion focused on appellant, he was

taken to the scene. The reaction of appellant, now that it was known that a crime had been committed, was itself sufficient to focus suspicion upon him as an accused even absent his record.

> "He had, by the time I saw him, had seen the body, and had become very upset, physically upset. I turned him away from the body at that time and attempted to calm him for several minutes. We left very shortly thereafter."

Prudently, if not necessarily, no questions were posed at this time.

> "Q. Did you ask him any questions?
> A. No, sir.
> Q. Did he say anything of an incriminatory nature?
> A. No, sir. He was just very shaken."

Upon returning to the barracks appellant was permitted to stop by his trailer and ask Betty Larmore to come with him. She arrived a little after he did, and upon her entry into the room appellant told her, in the presence of Hall and Keating, that "he had taken Rusty". He continued to talk with Betty for five or ten minutes and was then asked by police if he would give them a statement. *Miranda* rights were repeated *and appellant then signed a waiver form,* witnessed by Betty Larmore, prior to giving the statement. Indeed, appellant himself typed part of his statement which described that which he had done to Rusty Marine culminating in the boy's murder. To this point, still no inquiry had been made with regard to Troy Krause with whom we are here concerned, and when Leuschner was now asked about him, upon concluding the Rusty Marine confession, he at first denied any knowledge and again asked to see Betty Larmore.

*the case we are considering*

Now that the police were aware that Rusty had been murdered by Leuschner, in light of the content of his

confession, he was apparently suspected of similarly disposing of the missing Troy Krause. After talking to Betty Larmore, he called for Lt. Keating and asked him, not for a lawyer, nor to recant his former *Miranda* waiver, but

> "if Betty could give information with reference to Troy Krause, would she be entitled to the $5,000 reward."

This conduct itself indicates that even at this crucial juncture in the extrajudicial proceedings, the experienced and court-wise accused was capable of conniving for additional benefits as prerequisite to further confession. When the Lieutenant replied that he had no control over the reward offer, appellant

> "turned to Betty and said words to the effect that 'I took him, too.'

> . . .

> "When he said that, Betty sort of cried out 'No, you didn't' or 'You couldn't.' He said 'Yes, I took him.' He started telling me in her presence what had happened, where he picked him up on the road, and the boy wanted a ride to the YMCA, and as soon as the boy got in the truck he made a right turn, he didn't know the name of the road. He said shortly thereafter he made another right turn and came to a place where he could pull off the side of the road. He got out of the truck, and he said he could see the roof of an old home or a large home which was red. The roof was red. He said he couldn't see the whole house, he could just see part of the roof. He said he pulled the boy out of the truck and tied his hands and took him a short distance in the woods, approximately fifty yards and had sex with him. He said he held his hand over his mouth, and when he left the boy was laying on the ground.
>
> I questioned him, too, as to whether the boy was dead or alive, and he said he didn't know; that he was just laying there."

Appellant then agreed to help the police locate Troy and they left the barracks guided by appellant's direction. They found nothing and returned just before midnight. Precipitously appellant was presented to a commissioner and charged with the murder of Rusty Marine.

The next morning Lt. Keating, Trpr. Lewis, Betty Larmore (whom they picked up at her home) and Leuschner again "rode around", presumably with Leuschner trying to recall where he had left Troy. Leuschner, apparently recalling the polygraph discussion the previous day, asked then to take the test

> "to see if it would assist him and help, and he wanted to do everything he could to locate the Krause boy."

Appellant was then taken to the Easton barracks for the polygraph test, after which he was returned to Salisbury for a bond review before "Judge Dallas" of the District Court there. Judge Dallas not only advised appellant of his *Miranda* rights but

> "[h]e advised him not to talk to the police or anyone about this."

The next day, Wednesday, November 2nd, appellant was taken back to Easton to continue his polygraph examination. The examiner again advised appellant of his rights,

> "at which time Mr. Leuschner advised me that he was familiar with the rights and further that he had been advised by Judge Dallas to not to talk to the police and not to take any type of test; however, he wished to clear this matter up; he wished to help locate the body of Troy Krause; and therefore elected to continue with the test and to continue discussing the matter with the police."

Appellant even had the police try to find him a hypnotist to help him remember the location where he had left Troy, but they were unsuccessful.

Upon returning from Easton, Leuschner rode with Betty in the back seat. That night Betty called the officers and told them that appellant had given her exact directions to Troy's body. Two officers went with Betty; two others brought appellant into a woods on a farm in the area. Finally, midmorning (Thursday, November 3rd) Troy's body was found.

In the early afternoon an arrest warrant was obtained and, in the presence of a public defender who had recently appeared for appellant, was served upon him. He was promptly presented before the district court judge.

From our review of the circumstances it is clear, especially in regard to the Troy Krause crime, when appellant requested counsel on October 30th, appellant had not been focused upon as an accused sufficiently to trigger his Sixth Amendment right to counsel. *Escobedo, supra.* But even if that were not so, it is equally clear from his words and conduct that before confessing or even before a single question was asked regarding Troy Krause, appellant, in writing, waived his *Miranda* rights. *Butler, supra.*

*peripheral Miranda issues*

Although appellant contends that the Krause confession was inadmissible because the *Miranda* advisements were not given between the conclusion of his statement on Rusty Marine and the commencement of his admissions as to Troy Krause, we think the contention a specious one. Having obviously argued that the two were "connected in appellant's mind" — a premise to which we had to accede simply to address the foregoing concerns — he can hardly now be heard to argue that the dozen or so warnings given and the waiver signed just prior thereto, were not valid, recalled and clearly understood by appellant. Under the circumstances of this case, the waiver was so interrelated by time and circumstance, *Miranda* warnings having been repeatedly given by the same interrogators, there was no requirement nor legitimate purpose to be served by again administering them. *Smith v. State,* 20 Md. App. 577, 587 (1974), *cert. denied,* 272 Md. 748 (1974), *cert. denied,* 420 U.S. 909 (1975).

Finally, in the *Miranda* regard, appellant contends that because no fugitive warrant was obtained pursuant to Md. Code, Art. 41, §§ 28 and 28A, his initial arrest was illegal and the statements were inadmissible as the fruit of such illegality. Appellant having failed to raise this below has for practical purposes waived it on appeal. Md. Rules 736 and 1085.[6]

— traditional concepts of voluntariness —

*Betty Larmore*

Because appellant asserts the contrary, we preface this issue by noting that the admissibility of the statements made by appellant to Betty Larmore, his paramour, is not subject to constitutional standards of voluntariness. There is no contention that Betty Larmore was a police agent.

In *Brown v. State,* 10 Md. App. 462, 472-473 (1970), *cert. denied,* 261 Md. 722 (1971), we found no fault even with permitting an officer to testify to that which he had overheard spoken between two inmates in a contrived setting in jail. We noted that:

> "Here it is clear that the incriminating statements were not the product of any sort of coercion, legal or factual, physical or psychological. The conversations of Brown and Montgomery were wholly voluntary. Nothing said by either was prompted, inspired or solicited by Elliott [the undercover policeman] nor was it caused by or the result of any questioning of either by the officer. On the contrary the evidence is that he never even spoke to them. They simply talked without threat, promise or inducement on the part of the authorities in such circumstances that what they said could be overheard. Elliott, in a position to overhear, was under no obligation to close his ears. As the Court said in *Hoffa* [*v. United States,* 385 U.S. 293 (1966)], *supra,* at 303, quoting with

---

6. As pointed out in appellee's brief, the record indicates compliance with the statute in any case.

approval the words of the dissenting opinion in *Lopez v. United States,* 373 U.S. 427, at 465:

> 'The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.'

We hold that the receipt of Elliott's testimony with regard to the conversations of Brown and Montgomery did not violate the Fifth Amendment right against self-incrimination. See *Jefferson v. State,* 228 Md. 331.

. . .

> Even if the cell into which Brown and Montgomery went to converse be considered a constitutionally protected area, Elliott did not intrude therein physically and there was no electronic bugging. Nor was he in any sense a trespasser by his position in the tier aisle when he overheard the conversations. The Supreme Court said in *Hoffa,* at 302: 'Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' Certainly then, it cannot protect the wrongdoer voluntarily confiding his wrongdoing in such a manner that he can be overheard by a third person legally in a position to overhear. See also *Lewis v. United States,* 385 U.S. 206." 10 Md. App. at 472-474.

See also *Leuschner v. State,* 41 Md. App. at 429-434, *cert. denied,* 285 Md. 731 (April 23, 1979), *cert. denied,* 444 U.S. 933 (October 29, 1979).

The exclusionary rule is simply not applicable as to the statements made to Betty Larmore either in the presence of the officers or out of their hearing; but because we will

affirm the use of appellant's confessions to the police, that ruling is hardly necessary.

*the viewing*

Appellant contends that the first inculpatory statement he made to Betty Larmore and the police regarding Rusty Marine, *i.e.,* that "he had taken Rusty", was the involuntary product of a psychological coercion emanating from the graveside viewing of Rusty Marine's body, and as such was inadmissible. See *State v. Kidd,* 281 Md. 32, 36 (1977), *cert. denied,* 434 U.S. 1002 (1977). Quoting *Combs v. State,* 237 Md. 428, 435-436 (1965), he proceeds to reason that

> "where one confession is held to be involuntary and inadmissible, the State must overcome a presumption that the improper influence which produced the first confession is still in effect until a cessation of that influence is definitely shown, and the evidence to overcome and rebut such a presumption must be clear, strong and satisfactory, and any doubt on this point resolved in favor of the accused." [7]

While appellant alleges several factors contributing to the "psychological coercion", he discusses but one — "the act of taking appellant to the grave of Rusty Marine and showing him the body", aggravated by "continuous questioning". He contends that the six sessions on the first day of arrest (consuming approximately the same number of hours of interrogation) culminating in the act intending to shock a confession from the accused the following morning, must, in combination, be seen as psychologically coercive. He relies primarily upon a series of cases in other jurisdictions which have considered viewings of victims' corpses and "found that this technique, which seems always promptly to produce a confession, renders that confession involuntary. *See e.g.,*

---

7. See also Clewis v. Texas, 386 U.S. 707 (1967); United States v. Bayer, 331 U.S. 532, 540 (1947); Jackson v. State, 209 Md. 390 (1956); Edwards v. State, 194 Md. 387 (1950); Fried v. State, 42 Md. App. 643 (1979); Brown v. State, 6 Md. App. 564 (1969); Wiggins v. State, 4 Md. App. 95 (1968), *cert. denied,* 251 Md. 753 (1968); Keller v. State, 2 Md. App. 623 (1967). Fried, *supra,* makes it clear, however, that the taint doctrine does not apply to mere *Miranda* violations.

*State v. Peterson,* 75 A.2d 368 (Maine 1950); *State v. Crittenden,* 36 So. 2d 645 (La. 1948); *Williams v. State,* 22 So. 2d (Fla. 1945); *Cavazos v. State,* 172 S.W.2d 348 (Tex. 1943)."

We note initially that the mere viewing alone is by no means sufficient "coercion" to induce an accused to confess involuntarily. That which was viewed, of course, was the subject matter of the crime, the commission of which we will assume appellant was by then suspect. Showing him evidence of the subject matter was obviously intended by the police to elicit information, an investigative technique which has become a "standard procedure of interrogation" condoned by this Court in *Vines v. State,* 40 Md. App. 658 (1978), and the Court of Appeals affirming in *Vines v. State,* 285 Md. 369 (1979). See opinion dissenting on *Miranda* grounds in 40 Md. App. at 672. In that case, Jasper Vines was convicted of possession of heroin. The heroin contained in tinfoil packets, the subject matter of that crime, had been legally obtained under warrant from Vines' home and was displayed by the police to Vines, after he had invoked his *Miranda* rights, to elicit an inculpatory admission.

This Court and the Court of Appeals both condoned that police procedure, holding that it neither violated *Miranda* nor consisted of involuntary psychological coercion. In regard to the issue of voluntariness in the traditional sense, our majority's reasoning was adopted by the Court of Appeals.

> " 'It is not disputed that shortly before making the inculpatory disclosure, [Vines] had been fully apprised of his right to remain silent and that anything he said might be used against him in a court of law. It is also undisputed that he understood those rights. *Merely because the police entertained the hope (not expressed to [Vines]) that the display of narcotics would produce an incriminating statement does not mean that in allowing [Vines] to view the display they were improperly compelling, coercing, or inducing*

*[Vines] to speak.'* . . . *Vines,* 40 Md. App. at 661."
*Vines v. State,* 285 Md. at 380-381 (emphasis added).

Because of the western world's ingrained belief in the sanctity of human life, the viewing of a child's cadaver recently exposed in a shallow grave is psychologically more grotesque than a viewing of heroin recently possessed by an accused; but both viewings are purposed to the same end, *i.e.,* to elicit a confession. The viewing procedure itself is not conclusive of involuntariness, *Vines, supra.* A victim's remains would no more coerce, compel or improperly induce an innocent person to confess to a murder that he did not commit than a heroin display would coerce, compel or improperly induce an innocent person to confess to owning narcotics that he had not possessed.

Of course, the statement in *Kidd, supra,* relied on by appellant, that a confession may be rendered involuntary by either psychological or physical coercion is constitutionally supported by any number of Supreme Court opinions. *E.g., Blackburn v. Alabama,* 361 U.S. 199 (1960); *Fikes v. Alabama,* 352 U.S. 191 (1957); *Watts v. Indiana,* 338 U.S. 49 (1949) separate opinion; *Upshaw v. United States,* 335 U.S. 410 (1948). The contemporary responsibility of law enforcement officers to use more sophisticated methods of extracting confessions makes our review of the circumstances surrounding a confession more difficult because of the more delicate judgments to be made. *Spano v. New York,* 360 U.S. 315, 321 (1959). Thus, the range of inquiry in this type of case must be broad and the Supreme Court insists that the judgment in each instance be based upon the "totality of circumstances". *Blackburn, supra* at 206. Whether psychological coercion exists depends not only on a circumstance of pressure exerted but the effect of that pressure vis-a-vis the power of resistance of the person confessing. *Fikes, supra,* at 197.

"What would be overpowering to the weak of will or mind might be utterly ineffective against an

experienced criminal." *Stein v. New York,* 346 U.S. 156, 185 (1953).

And as we conduct our independent review of the record, mandated by the Supreme Court, see *Walker v. State,* 12 Md. App. at 694, we are not restricted to that which is revealed at the suppression hearing prior to admission of the confession but may — and should — review the record in its entirety from stem to stern.

> "... [W]e reject the notion that the scope of our review can be thus restricted. Where the involuntariness of a confession is conclusively demonstrated at any stage of a trial, the defendant is deprived of due process by entry of judgment of conviction without exclusion of the confession." *Blackburn, supra* at 210.

Obviously then, if such review is mandated from the defendant's view, the sauce for the goose is so for the gander as well. If we are to review the entire record for circumstances indicative of involuntariness, we should range that far in the record for evidence of voluntariness as well. Justice is (or should be) concerned with the truth, whether it convicts or exonerates. In this case such latitude will help us to determine whether appellant is one "weak of will or mind" easily overpowered by psychological pressures or whether he is "an experienced criminal" against which such devices would be "utterly ineffective". At the time of this review we know from information derived at sentencing, as well as testified to in the suppression hearing, that Leuschner had been thrice convicted of violent crimes prior to his conviction in this case. Beyond that, he was convicted of nonviolent crimes and was a fugitive from California justice. He is, as pointed out by the trial judge, and as indicated above, court-wise and experienced in the system.

In the light of that experience, we then look at the circumstances giving rise to the confession, *Bram v. United*

*States,* 168 U.S. 532 (1897).[8] There is presumably no restriction upon factors that may be considered but the cases generally have emphasized those which should not be overlooked. These include: 1) the accused's age, *Spano, supra; Chambers v. Florida,* 309 U.S. 227 (1940); 2) his character, *Harris v. South Carolina,* 338 U.S. 68 (1949); 3) his record as to former crimes, *Spano, Stein* and *Fikes,* all *supra;* 4) educational background, *Ward v. Texas,* 316 U.S. 547 (1942) and *Spano, Harris* and *Fikes,* all *supra,* but see *Lisenba v. California,* 314 U.S. 219 (1941), indicating that intelligence and business experience may offset lack of formal education; 5) mental capacity, *Payne v. Arkansas,* 356 U.S. 560 (1958); *Brown v. Mississippi,* 297 U.S. 278 (1936) and *Lisenba, Ward* and *Fikes,* all *supra;* 6) the legality or illegality of arrest, *Payne* and *Ward,* both *supra;* 7) the conditions of his incarceration, *Payne, Watts* and *Fikes,* all *supra;* 8) delay in presentment to a commissioner, *Johnson v. State,* 282 Md. 314 (1978); 9) removal to a distant jail, *Ward* and *Fikes,* both *supra;* 10) prolongation of interrogation — see, *e.g., Ashcraft v. Tennessee,* 332 U.S. 143 (1944); *Turner v. Pennsylvania,* 338 U.S. 62 (1949) and *Leyra v. Denno,* 347 U.S. 556 (1954); see also *Ward, Blackburn, Spano, Harris* and *Fikes,* all *supra,* but compare *Brown v. Allen,* 344 U.S. 443 (1953) and *Lisenba,* and *Stein,* both *supra,* see also comment note 69 L.Ed. 131 — with deprivation of refreshment, rest or relief, *Payne, Watts* and *Stein,* all *supra,* by relays of interrogators, *Fikes, supra,* while isolated for a substantial time, *ibid,* without counsel, friends, relatives or disinterested persons, *Blackburn, Spano, Payne, Fikes, Chambers* and *Harris,* all *supra;* and 11) the failure to warn or apprise the accused of his rights, *Payne, Watts, Harris, Turner* and *Haley,* all *supra.*

It is important to emphasize that none of these factors standing alone would have been conclusive. In this case, standing alone, no single factor was so dominant even so as to give us pause. The interrogation was not so prolonged or

---

**8.** Oddly, in doing so we may even consider events which occurred *after* the confession was obtained. Haley v. Ohio, 332 U.S. 596 (1948).

unremitting as to place undue physical or mental strain on appellant who was a mature, intelligent and court-wise person, and

> "not young, soft, ignorant or timid. [He was] not inexperienced in the ways of crime or its detection, nor [was he] dumb as to [his] rights." *Stein,* 346 U.S. at 185-186.

To the contrary, he was reapprised of his rights each time his location or interrogators changed. That there were different interrogators at different times is not sufficient to indicate an overbearing of appellant's will by "relays" used to wear him down. See *Lisenba, supra.* The Supreme Court has

> "never gone so far as to hold that the Fourteenth Amendment requires a one-to-one ratio between interrogators and prisoners, or that extensive questioning of a prisoner automatically makes the evidence he gives in response constitutionally prohibited." *Stein, supra* at 185.

Appellant was legally arrested as a fugitive, apprised repeatedly of his rights, granted an opportunity to call an attorney, permitted to see and be with his paramour, uncaged, courteously treated and refreshed by food, drink and tobacco. To preclude a confession obtained by such an interrogation, under these circumstances, is to deny the use of interrogation as a police tool.

> "Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not. By their own answers many suspects clear themselves, and the information they give frequently points out another who is guilty. Indeed, interrogation of those who know something about the facts is the chief means to solution of crime. The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material

witness. This Court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and not coercive.

Of course, such inquiries have limits. But the limits are not defined merely by calling an interrogation an 'inquisition,' which adds to the problem only the emotions inherited from medieval experience. The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein, supra* at 184-185 (footnote omitted).

Nor did the viewing of the victim at the burial scene, alone or in circumstantial context, imply that the appellant's will was overpowered. As acknowledged in *Vines,* it was obviously an inducement to a confession by a guilty person, but hardly so to an innocent one.

So much concludes our response to appellant's first issue which was:

"I. The trial court erred in admitting into evidence numerous inculpatory statements made by Appellant.

   a. implicitly ruling that they were voluntary.

   b. ruling that they were made in compliance with *Miranda.*

   c. overlooking the question of whether they were the product of an illegal arrest."

The twelve issues that follow require less need for verbosity to address. The issues remaining are:

"II. The trial court erred in sentencing Appellant to life without parole.

III. There was insufficient evidence to sustain the verdict that Appellant was sane.

IV. Appellant was denied his constitutional right of confrontation, along with evidentiary and procedural rights.

V. The trial court erred in permitting Sgt. Griffith to testify as to statements made by Appellant.

VI. Appellant was deprived of a fair trial by the prejudicial remarks made by the prosecution in closing argument.

VII. The trial court erred in failing to conduct individual voir dire of the jurors on the issues of prejudicial pretrial publicity and prejudice relating to the defense of insanity.

VIII. Appellant was prejudiced by the instructions to the jury.

IX. The evidence was insufficient to sustain the convictions.

X. Appellant was tried on an indictment that was illegal, duplicitous, and insufficient.

XI. Appellant was tried illegally on the 'greater charges' relating to Troy Krause following their severance from the 'lesser charges' relating to Russell Marine.

XII. Appellant was illegally tried in violation of Maryland Rule 746.

XIII. Appellant was denied the adequate assistance of counsel.",

and we shall address them briefly seriatim.

— the sentence —

Appellant's complaint of an illegal mandatory sentence is without foundation. Md. Code, Art. 27, § 643B (b) provides that any person who has "served" three separate terms for violent crime convictions, shall be sentenced to life imprisonment without parole possibilities. His argument is

that he has not "served" three sentences because even counting the two rape convictions in California (from which he is a parole fugitive) as being "served", the third sentence was for the murder of Rusty Marine. Even if the Rusty Marine sentence requires completion as the third under the statute, however, appellant will not have commenced serving his Krause sentence until that third sentence has been "served". The Krause sentence being consecutive so ordains.[9]

— sanity —

Appellant's attack upon the sufficiency of the evidence to prove appellant sane is merely a questioning of the relative weights that he feels should be given the opinions of the experts who testified. Our review clearly indicates that there was ample from which a factfinder could conclude appellant was sane, beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 61 L. Ed. 2d 560 (1979).

— the psychiatric testimony —

Appellant attempts to seize upon our holding in *Gregory v. State,* 40 Md. App. 297 (1978), that psychiatric reports containing opinions of absent witnesses are improperly admitted over objection in violation of the right of confrontation; however, appellant has waived that claim by failing to make a timely objection below and by having instigated the evidence he now deplores. *Leonard v. State,* 36 Md. App. 385, 387 (1977); *Sutton v. State,* 25 Md. App. 309, 316 (1975). By having opened the door to the staff opinion of Perkins State Hospital through cross-examination, appellant affirmatively waived objection. *Peisner v. State,* 236 Md. 137, 144 (1964), *cert. denied,* 379 U.S. 1001 (1965); *Leuschner v. State,* 41 Md. App. at 435-436 (1979).[10]

---

**9.** Appellant also attempted by footnote to raise a constitutional attack on the statute. We have chosen the same means to apprise him that we will not address that constitutional question since it was not raised and decided below. von Lusch v. State, 279 Md. 255, 262-263 (1977); Vuitch v. State, 10 Md. App. 389, 397-398 (1970), *cert. denied,* 261 Md. 729 (1971), *cert. denied,* 404 U.S. 868 (1971).

**10.** Appellant's complaint of "evidentiary and procedural rights" is not addressed by us because the two sentence attack provides neither argument, transcript reference nor legal authority to support it. Van Meter v. State, 30 Md. App. 406, 407-408 (1976), *cert. denied,* 278 Md. 737 (1976).

*— the polygraph examiner's testimony —*

There is no testimony before the jury in the record relating to the polygraph examination. *Akonom v. State,* 40 Md. App. 676 (1978), *cert. denied,* 284 Md. 741 (1979), as relied upon by appellant, is totally inapposite. See also *Mason v. State,* 44 Md. App. 710 (1980). No issue was raised as to the coercive effect it may have had as a tool of interrogating to psychologically induce a confession. See *Johnson v. State,* 31 Md. App. 303 (1976).

*— prejudicial closing argument —*

Appellant has waived any complaint he may have had to the closing argument by failing to object thereto. *Holbrook v. State,* 6 Md. App. 265, 270-271 (1969).

*— individual voir dire —*

Again, appellant's afterthoughts failed to preserve his complaint for review. His objection made at the conclusion of the trial, to failure of individual voir dire at the commencement of the trial, comes too late.

*— instructions —*

Appellant was not merely too late with objection to the instructions regarding the felony-murder law, he failed to enter one. This too waives his right to raise it on appeal. Md. Rule 757 f.

*— sufficiency of the evidence —*

Appellant's contentions in ' regard to evidentiary sufficiency are predicated upon our holding that the confessions and admissions were inadmissible. We have decided otherwise; the evidence was abundant. *Jackson v. Virginia, supra.*

*— sufficiency of the indictment —*

Appellant has waived the right to challenge the charging document by failure to comply with Md. Rule 736 a.

— the chicken or the egg —

Appellant contends that he was tried illegally on the "greater charges" relating to Troy Krause following their severance from the "lesser charges" relating to Rusty Marine. Again, appellant has waived this argument by failure to raise it below. Md. Rule 1085. Furthermore, we are not quite certain why, of these separate crimes, one is greater and the other lesser. The rationale of the case cited, *Blackledge v. Perry,* 417 U.S. 21 (1974), is, if apposite, lost to us.

— Md. Rule 746 —

Again, the question of compliance with Md. Rule 746 (or of a speedy trial right) was not made below and is waived here. The rule was only mandatory after July 25, 1979 in any case. *State v. Hicks,* 285 Md. 310, 336 (1979). Appellant was tried on June 19 and 20 of 1979.

— competency of counsel —

We have traditionally held that competency of counsel is a question best left to post conviction procedures although we can review the record if it is propitiously raised and decided below. See *Turner v. State,* 45 Md. App. 168 (1980). Appellant voiced his complaint at the close of all the evidence and prior to instructions to the jury; however, even if the court having observed counsel's conduct could have made a valid judgment, all the facts were not in. In the first instance, how can one judge competency of counsel at that point until the case has been decided? Had the verdict been in appellant's favor, he would hardly have condemned success.

More practically, however, such an issue places the attorney on trial and the better practice is to permit him to explain whether the questioned judgments he has made were tactical or not. Furthermore, a trial judge as factfinder is then given an opportunity whether to believe such explanations. We will leave that issue for a procedure better

equipped to decide it initially. *White v. State,* 17 Md. App. 58, 64 (1973), *cert. denied,* 268 Md. 754 (1973).

*Judgments affirmed.*
*Costs to be paid by appellant.*