ELWOOD LEROY LEUSCHNER *v.* STATE OF
MARYLAND

[No. 945 (On Remand), September Term, 1979.]

*Decided September 2, 1981.*

The cause was submitted on remand to LOWE, COUCH and WEANT, JJ.

LOWE, J., delivered the opinion of the Court.

Perhaps to lay speculation to rest that time, change and the Supreme Court were eroding the *Miranda v. Arizona* [1] rule that given an assertion by an accused of his right to counsel (police) " 'interrogation must cease until an attorney is present,' " on May 18, 1981 the Court decided *Edwards v. Arizona* [2] to

> "reconfirm these views and to lend them substance, emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485, 68 L.E.2d at 387.

Despite the sense of need to reconfirm its faith in *Miranda,* the Court strove carefully to assure that it did not intend to impede legitimate methods of law enforcement by further expanding *Miranda:*

> "In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, *nothing* in the Fifth and Fourteenth Amendments *would prohibit the police from merely listening to his voluntary,*

---

1. 384 U.S. 436 (1966).
2. 451 U.S. 477, 68 L.E.2d 378 (1981).

*volunteered statements and using them against him at the trial.* The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. *Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.* Rhode Island v. Innis, [446 U.S. 291, 64 L.Ed.2d 297 (1980),] supra, makes this sufficiently clear. 446 U.S., at 298, n. 2." 451 U.S. at 485-486, 68 L.Ed.2d at 387, (emphasis added).

The facts in *Edwards* considered "critical" by the Supreme Court were that Edwards had asserted his right to counsel and his right to remain silent on January 19; but the police, without furnishing him counsel, returned the next morning to confront him and as a result of the meeting secured incriminating oral admissions. The issue as seen by the Court was whether Edwards validly waived his right to have counsel present during interrogation.

For two reasons the Supreme Court decided that Edwards had not validly waived that right. First, it pointed out that neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it. The Arizona courts had been preoccupied solely with the traditional concepts of voluntariness and had misunderstood the requirement of finding a valid waiver of the right to counsel, once invoked.

Secondly, the Supreme Cout noted that although an accused may by his words or conduct waive his *Miranda* rights, *North Carolina v. Butler* (441 U.S. 369 (1979)) had strongly indicated that additional safeguards were necessary to establish a waiver when an accused has asked for counsel. The holding of *Edwards* was simply an explication of the *North Carolina v. Butler* implication. The holding as expressed by the Court in *Edwards* was

"that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges or conversations with the police.*" 451 U.S. at 484-485, 68 L.Ed.2d at 386 (emphasis added, footnote omitted).

— the question before us —

During the time *Edwards* was being considered, there reposed at the Supreme Court a pro se petition for certiorari submitted by Elwood Leroy Leuschner, from a recent affirmance by this Court of a conviction for having sodomized and murdered a young boy named Troy Krause. On the same day that it decided *Edwards,* the Supreme Court vacated our judgment and remanded to us *Leuschner v. State,* 45 Md. App. 323 (1980), *cert. denied* July 3, 1980 (by Maryland Court of Appeals), 288 Md. 738 (1980), for our review in the light of *Edwards.*

We have carefully reviewed both cases and find that *Edwards* enhances our original opinion in *Leuschner* rather than eroding it. Perhaps that is because our interpretation of *Miranda* has always included the *Edwards'* nuance, *e.g., Cummings v. State,* 27 Md. App. 361, 366-367, *cert. denied,* 276 Md. 740 (1975); *cf. Law v. State,* 21 Md. App. 13, *cert. denied,* 272 Md. 744, 749 (1974), and in *Leuschner* we, therefore, approached the *Miranda* issue in that "light." We will do so once again.

The critical facts [3] in the *Leuschner* case arose from a

---

**3.** A detailed narration of all the facts is set forth in 45 Md. App. 323, together with supporting extracts of testimony.

search for a 9-year-old boy named Troy Krause, who had been missing for 3 months. When another youngster about the same age (named Rusty Marine) was reported missing also, the police were told by Rusty's stepfather that his neighbor, Elwood Leuschner, had last seen Rusty near their residences.

Because Leuschner's niece had previously related that Leuschner had a criminal record, his description was entered by the State Police in a National Crime Information Center Computer. The four-page criminal record indicated that, among other things, Leuschner was wanted in California for parole violation. He was then arrested by Maryland State police on a fugitive warrant and immediately advised of his rights. Although he invoked his right to counsel on the fugitive charge, he pointedly stated that he was perfectly willing to talk to the police about the missing boy, Rusty Marine, who had been the initial subject of inquiry when Leuschner was first approached. He told the police that with regard to the Rusty Marine inquiry, he did not desire an attorney and that he did not need one.

Perhaps because of the domiciliary proximity, the succeeding inquiry initially focused solely upon Rusty Marine who had recently disappeared. No questions appear to have been asked regarding Troy Krause, the victim in the case we were admonished to review, who had disappeared 3 months before.

Although Leuschner was in custody, having been detained upon the fugitive warrant, *Mathis v. United States,* 391 U.S. 1 (1968), the police attempts to discern Rusty's whereabouts through Leuschner were conducted in an atmosphere of inquiry rather than as an inquistion; cigarettes, sandwiches, coffee and even Leuschner's consultations with his paramour were provided upon request. Whenever a different officer would talk with Leuschner, out of an abundance of caution, Leuschner would again be advised of his *Miranda* rights.

Perhaps because he recognized discrepancies within his interviews, during the late afternoon of the day of his arrest,

Leuschner asked for an attorney. This request was not speci-
fied in regard to the fugitive warrant under which he was
detained, but was obviously in regard to the Rusty Marine
questioning. The police offered Leuschner the use of the tele-
phone (already next to him) to call an attorney or, in the
alternative, offered to call an attorney for him. Leuschner
neither called nor requested assistance but asked rather to
see his paramour, Betty Larmore, who was in the next room
and who was immediately brought into the interrogation
area. Without the slightest instigation by the police officers,
Leuschner continued his conversation, talking first to Ms.
Larmore in the presence of the officers and subsequently
joining them in his conversation.

Since this was the last credible evidence that Leuschner
either requested counsel or otherwise even interpretively
sought to invoke his Fifth Amendment right,[4] we addressed
the issue of waiver on those facts, applying Leuschner's
passing but general request for counsel as if he had invoked
his right to counsel regarding the victim Troy Krause; how-
ever, it was days later after signing a *Miranda* waiver form
and after confessing to the Rusty Marine murder that the
Krause inquiry was first broached. Such a — perhaps
unnecessary — dilution of the "fruit-of-the-poisonous-tree
theory" to benefit Leuschner does nothing to taint the fruit,
however, because the *Edwards* antidote neutralized any poi-
sonous affect of the tree itself.

In *Leuschner, supra,* we addressed the question of the
*Miranda* waiver following an invocation of the right and,
unlike the Arizona courts, we clearly understood both the
requirement and the standard for finding a valid waiver of
the right to counsel once invoked despite a finding of
traditional voluntariness as well. We held that waiver of
counsel was not only voluntary but constituted a knowing
and intelligent relinquishment or abandonment of a known
right or privilege

---

4. It should be noted that although our prior opinion discussed the judi-
cial marriage of the Fifth and Sixth Amendment culminating in Miranda,
Edwards addresses only "[t]he Fifth Amendment right identified in
Miranda [as] the right to have counsel present at any custodial interroga-
tion." 451 U.S. at 485-486, 68 L.Ed.2d at 387.

"on 'the particular facts and circumstances surrounding that case, including the *background, experience, and conduct of the accused.*' " 45 Md. App. at 330, quoting *Butler, supra* at 374-375.

We used as our standard that which was set forth in *North Carolina v. Butler,* 441 at 374-375, as subsequently explicated by *Edwards.* Expressly using the strong safeguards standard indicated by *Butler* (and now expressed by *Edwards*), we set forth in detail "the background, experience and conduct" of the accused, as well as "the particular facts and circumstances surrounding th[e] case". *Edwards,* 451 U.S. at 482, 68 L.Ed.2d at 385.

— was there in fact "interrogation" —

But in "light" of Edwards, the particular facts and circumstances of the *Leuschner* case would have made the waiver determination unnecessary. Relying on *Rhode Island v. Innis,* 446 U.S. 291, 64 L.Ed.2d 297 (1980), *Edwards,* as we have quoted it, points out that absent an *interrogation* by the police there would be no occasion to determine whether there had been a valid waiver. *Innis* indicates that "interrogation" may be in the form of either express questioning or its "functional equivalent" which may consist of any "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis, supra,* 446 U.S. at 301, 64 L.Ed.2d at 308, (footnote omitted). The opinion further points out that:

" 'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300, 64 L.Ed.2d at 307.

Whether police conduct is tantamount to a reinterrogation following Fifth Amendment invocation by request for counsel in the contemplation of *Miranda,* is also dependent upon the particular facts and circumstances of each case. *Vines v.*

*State,* 285 Md. 369, 376 (1979). Here, although Leuschner's version contradicted portions of the State's case as to his request for an attorney as well as his advisement of rights, the judge simply did not believe him and did believe the State's testimony. While his ruling was from a position of advantage, our own independent constitutionally required review of a cold record reveals clearly that his judgment was correct. That record reveals not a scintilla of compulsion, nor any indication that there were words (or actions which were their functional equivalent) which would have been reasonably likely to elicit an incriminating response. There was simply no interrogation by the police until well after Leuschner had, by his conduct, words and actions, waived the prior invocation of his right to have counsel present.

— did the police initiate it —

Parenthetically we must recognize that when two justices of the Supreme Court are "not sure what [*Edwards*] means," our view of the *Edwards'* "light" with which we are admonished to illuminate *Leuschner* in this review, may be shaded. These two justices, in a concurring opinion, stated that there were two ways of looking at the light cast by *Edwards.* One of those we have used — that the Court's opinion can be read as not departing from established doctrine — and we reaffirm our former judgment.

But even in light of the more radical possibility posed by the two of the three concurring justices — that the opinion created a new per se rule requiring a threshold inquiry as to precisely who opened any conversation between the accused and State officials — our former opinion suffices to respond as we have previously indicated. The trial judge believed the testimony that no further questions were asked to elicit the narrations following appellant's second request for counsel and we found no reason to believe to the contrary. *Leuschner, supra* at 337 n. 5.

If the two concurring justices are correct that

"police do not impermissibly 'initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney," 451 U.S. at 490, 68 L.Ed.2d at 390,

surely an "interrogation" is not "initiated" by officers whose only conduct or conversation following the demand for an attorney is an offer of a telephone and to assist if desired. Listening to a garrulous "suspect" uninterruptedly rattle on alternately to his girlfriend and the police is not an "initiation" of an interrogation — even if such conduct could have been interpreted as a functional equivalent of questioning. *Edwards* then has not only affirmed our waiver approach based upon the *Butler* standard we applied, but has provided alternative routes by which we might have arrived at the same destination.

*Judgment affirmed.*
*Costs to be paid by appellant.*